UNITED STATES of America, Appellee,

v.

Jeffrey R. MacDONALD, Appellant.

Nos. 75–1870, 75–1871.

United States Court of Appeals,
Fourth Circuit.

Argued Oct. 8, 1975.

Decided Jan. 23, 1976.

Bernard L. Segal, San Francisco, Cal. (Orrin Leigh Grover, III, San Francisco, Cal., Michael J. Malley, Washington, D. C., Robert H. Hood, III, Research Triangle Park, N. C., Kenneth A. Letzler, and Jon Van Dyke, San Francisco, Cal., on brief), for appellant.

Brian M. Murtagh, Atty., U. S. Dept. of Justice, Washington, D. C. (Thomas P. McNamara, U. S. Atty., Raleigh, N. C., Victor C. Woerheide, Atty., U. S. Dept. of Justice, Washington, D. C., and James T. Stroud, Jr., Asst. U. S. Atty., Raleigh, N. C., on brief), for appellee.

Before CRAVEN, BUTZNER and RUSSELL, Circuit Judges.

BUTZNER, Circuit Judge:

Jeffrey Robert MacDonald appeals from the denial of several motions relating to his prosecution for the 1970 deaths of his wife and two daughters.[1] We conclude that the

---

1. The district court has jurisdiction because the crimes were committed on a military base. 18 U.S.C. §§ 7(3), 1111, and 3231.

delay of four and one-half years, dating from the Army's accusation and detention of MacDonald in May 1970 to his indictment in January 1975, even when allowances are made for several intervals, violates the right to a speedy trial guaranteed by the sixth amendment.[2] We therefore reverse and order dismissal with prejudice.

## I

■ We stayed MacDonald's trial and allowed this interlocutory appeal pursuant to our decision in *United States v. Lansdown*, 460 F.2d 164, 170–71 (4th Cir. 1972).[3] There, we held that 28 U.S.C. § 1291 did not bar an interlocutory appeal in criminal cases where important rights, collateral to the main action, would be irreparably lost unless considered before trial. *But see United States v. Bailey*, 512 F.2d 833 (5th Cir. 1975). In *Lansdown* the appeal was from an order rejecting a plea of double jeopardy. We held that post-trial consideration of the issue could provide only inadequate relief because the double jeopardy prohibition was intended to prevent the hardship of undergoing a second trial. *See Green v. United States*, 355 U.S. 184, 187, 78 S.Ct. 221, 2 L.Ed.2d 199 (1957). The denial of MacDonald's plea of double jeopardy, like Lansdown's, is a proper subject for interlocutory review, but for reasons discussed in Part IV, we believe it preferable not to decide this issue. Instead, we have rested our decision on the sixth amendment's provision for a speedy trial.

■ Pendent to the double jeopardy claim, and closely related to it, is MacDonald's affirmative defense of denial of a speedy trial. This sixth amendment claim is also collateral and can be decided without considering the merits of the charges against MacDonald. The guarantee of a speedy trial is a fundamental constitutional right. *Braden v. Judicial Circuit Court*, 410 U.S. 484, 489–90, 93 S.Ct. 1123, 35 L.Ed.2d 443 (1973); *Klopfer v. North Carolina*, 386 U.S. 213, 223–25, 87 S.Ct. 988, 18 L.Ed.2d 1 (1967); *Kane v. Virginia*, 419 F.2d 1369, 1371–73 (4th Cir. 1970). Not every speedy trial claim, however, merits an interlocutory appeal. Generally, this defense should be reviewed after final judgment. It is the extraordinary nature of MacDonald's case that persuaded us to allow an interlocutory appeal.

The hearing conducted by the Army in 1970 lasted for more than a month, and the government estimates that the trial would take six to eight weeks. The prosecution's case is wholly circumstantial and rests on a detailed, hypothetical reconstruction of the crime. Witnesses, who have scattered across the country in the last five years, must be interviewed and assembled at great expense to both the government and the defense.

■ MacDonald's collateral defenses of double jeopardy and denial of a speedy trial are not fanciful. Never before, as we mention in Part IV, has a soldier been prosecuted by civilian authorities after being exonerated by his commanding officer following an Article 32 hearing; and a delay of five years between the initiation of prosecution and trial is extraordinary. Had we denied the interlocutory appeal and subsequently sustained either of MacDonald's collateral defenses, all of the burdens on the

---

2. "In all criminal proceedings, the accused shall enjoy the right to a speedy and public trial . . . ." U.S.Const. amend. VI.

3. In our order of August 15, 1975, allowing MacDonald's petition for an interlocutory appeal, we noted his contentions that he had been denied his rights against double jeopardy and to a speedy trial. We then concluded ". . . that the contentions made are not frivolous and that the rights asserted are too important to be denied review, and if review is postponed until after the trial of the case, claimed rights will have been irreparably lost. *United States v. Lansdown* . . . ."

We also allowed MacDonald to appeal issues that would otherwise be subject to the final judgment rule, saying: "In view of our accepting the appeal of [the orders overruling the double jeopardy and speedy trial defenses], we will also consider the other questions sought to be appealed, which, if not now presented, might occasion further delay in terminating this litigation." *See* part IV *infra*.

court and the parties of a prolonged, expensive trial would be for naught. These factors, which we regard as unique, were the basis for allowing this appeal.

## II

In the early morning of February 17, 1970, military police received a call for help from Captain MacDonald, a physician stationed at Fort Bragg, North Carolina. Upon arriving at the family's quarters, the police found Mrs. MacDonald and the couple's two daughters clubbed and stabbed to death. MacDonald told the police that screams of his wife and six-year-old daughter awoke him from the couch in the living room. He said that during a short struggle four assailants stabbed him and knocked him unconscious. Upon regaining his senses, he attempted to revive his family and telephoned for help.

The military police, the Army's Criminal Investigation Division (CID), the F.B.I., and the Fayetteville, North Carolina, police department immediately began an investigation of the crime. Examination disclosed that each member of the MacDonald family had a different blood type. The location of the victims' blood in the apartment and the presence of one daughter's blood on MacDonald's glasses cast doubt on MacDonald's account. Similarly, the presence of stray fibers from his pajama top in the master bedroom did not correspond with MacDonald's statement that it was ripped in a struggle in the living room. Torn and bloody pieces of surgical gloves, apparently of a type kept by MacDonald, were found near the victims. Although there were numerous unidentified fingerprints in the apartment, no direct evidence of the alleged intruders was found. From these and other circumstances, investigators theorized that MacDonald had killed his family and staged the murder scene to cover up his crime.

On April 6, 1970, the CID questioned MacDonald and informed him that he was under suspicion. That same day he was relieved of his medical duties and restricted to quarters by his commanding officer. On May 1, 1970, the Army formally charged him with the murders.

Major General Edward M. Flanagan, Jr., Commanding General of the unit to which MacDonald was assigned, appointed Colonel Warren V. Rock to investigate the charges, with the assistance of a legal officer, in accordance with Article 32 of the Uniform Code of Military Justice. Colonel Rock's final report described the manner in which the Article 32 proceedings were conducted:

"In view of the fact that both government and defense were represented by counsel, the hearing was conducted in generally the same format as a trial. Government presented its evidence and rested, defense did likewise and finally the Article 32 Officer called for witnesses and evidence. In all instances opposing counsel was given the full right of cross examination. It was necessary to give considerable latitude to counsel and permit the introduction of some hearsay-type evidence for both sides. The legal advisor sat next to the Investigating Officer throughout the hearing and his sole function was to assist him in making proper legal rulings on all questions that arose."

The government called 27 witnesses and MacDonald 29, including many character witnesses. He himself testified and was subjected to extensive cross-examination.

At the conclusion of the Article 32 proceedings, Colonel Rock filed an exhaustive report in which he recommended that "[a]ll charges and specifications against Captain Jeffrey R. MacDonald be dismissed because the matters set forth in all charges and specifications are not true. . . ." He also recommended that the civilian authorities investigate a named suspect. On review of Colonel Rock's report, General Flanagan dismissed the charges on October 23, 1970, and reported this to the Commanding General of Fort Bragg, who took no further action. Shortly afterward, the Army released MacDonald from quarters and, underscoring the finality of the military proceed-

ings, it granted him an honorable discharge for reasons of hardship in December 1970.[4]

Following MacDonald's discharge, the Department of Justice asked the CID to continue its investigation. The CID complied, conducting 699 interviews. At the request of the department, it sent the weapons and the victims' clothing to the F.B.I. laboratory in July 1971 and in August furnished the Treasury Department's laboratory other items for analysis. The CID completed its field investigation in December 1971, and in June 1972 it transmitted to the Justice Department a 13-volume report recommending prosecution. A number of government attorneys studied the report and asked for further investigations. The CID filed two supplemental reports, but upon receiving a request for additional investigation, it suggested convening a grand jury before it expended any more effort. Finally, in August 1974 the government started presenting the case to a grand jury. Concurrently, the F.B.I. examined several items from the MacDonald house, and it exhumed the bodies of Mrs. MacDonald and the children to obtain hair samples.

Shortly after his discharge, MacDonald moved to California where he resumed the practice of medicine. In 1971 he was again interviewed by the CID. Beginning in January 1972 and continuing through January 1974, MacDonald, first in person and then through letters by his attorneys, requested the government to complete its investigation. He repeatedly offered to submit to an interview by the government attorneys in charge of the case.[5] The attorneys, however, declined to question him and to advise when their investigation would be completed. The correspondence appears to have come to an end in January 1974, leaving MacDonald in suspense.[6] MacDonald was subsequently subpoenaed to appear before the grand jury. He waived his right to remain silent and testified on two occasions for a total of more than five days.

The grand jury indicted MacDonald on January 24, 1975. He was promptly arrested in California and a week later admitted to bail. He moved to have the indictment dismissed, contending that the government's delay in obtaining it denied him the right to a speedy trial. The district court denied the motion, holding that MacDonald's right to a speedy trial did not arise

---

4. MacDonald's discharge barred any further military proceedings against him. *United States ex rel. Toth v. Quarles*, 350 U.S. 11, 76 S.Ct. 1, 100 L.Ed. 8 (1955).

5. For example, on March 27, 1973, MacDonald's attorney wrote an attorney in the criminal division of the Department of Justice:
 "I am taking the liberty to again urge upon you and the Justice Department to accept our offer to submit Dr. MacDonald to an in depth on-the-record interview by your office. "It seems to me that there are mutual advantages to our suggestion. From the standpoint of your office it would present the opportunity to perhaps obtain answers to some of the questions that may have arisen in your minds as a result of the study of the record and investigative reports in this case. From our standpoint we believe that an interview with Dr. MacDonald can only confirm the correctness of the finding of the Army's own initial hearing officer, Colonel Rock."

6. On January 8, 1974, MacDonald's counsel wrote:
 "It is with some reservations that I write this letter to you to inquire about the status of

your Department's review of the investigation of the deaths of the MacDonald family at Ft. Bragg, North Carolina. However, in fairness to my client who has lived with the twin tragedies of those deaths and the unfounded suspicion of himself in connection with them, that I ask whether a final decision has been made in connection with any Federal criminal action against him. If such a decision has not yet been made may I inquire as to when we may reasonably expect it to be made.
 "I again renew to you our previously stated offer to submit Dr. MacDonald to full questioning by attorneys of the Department of Justice."
 The chief of the General Crimes Section replied on January 23, 1974:
 "For your information, this case is under active investigation and will remain under consideration for the foreseeable future.
 "I do not believe it would serve any useful purpose at this time to accede to your request that Jeffrey MacDonald be questioned by attorneys from the Department of Justice."

until the government accused him of the crime by the return of the indictment in January 1975.[7]

### III

■ To determine whether a person charged with crime has been denied a speedy trial in violation of the sixth amendment, it is necessary to weigh the conduct of both the prosecution and the defendant. *Barker v. Wingo*, 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). Recognizing that this balance compels an ad hoc appraisal of each case, *Barker* identified four factors that must be considered. They are "[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." 407 U.S. at 530, 92 S.Ct. at 2192. We will assess each separately.

*Length of delay.* The critical issue concerning this aspect of the case is the identification of the event, and consequently the date, marking the beginning of the delay. The district court accepted the government's position that MacDonald's right to a speedy trial arose only after he was indicted in January 1975. MacDonald acknowledges that no significant delay has occurred since then. He contends, however, that the delay commenced when the Army formally charged him with murder on May 1, 1970, and restricted him to quarters. The length of delay, therefore, depends entirely on whether the pre-indictment delay on which MacDonald relies is of constitutional significance.

In *United States v. Marion*, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971), the Court held that a three-year delay between the commission of a crime and indictment

did not infringe the right to a speedy trial. The defendants in that case, however, were not arrested or formally accused of crime until the return of the indictment. Noting this, the Court carefully avoided adopting a simplistic rule that pre-indictment delay is always immaterial. Instead, referring to the values which the speedy trial provision safeguards, the Court explained that arrest furnishes an alternative starting point for determining the length of delay. It said:

"[I]t is readily understandable that it is either a formal indictment or information or else the actual restraints imposed by arrest and holding to answer a criminal charge that engage the particular protections of the speedy trial provision of the Sixth Amendment.

"Invocation of the speedy trial provision thus need not await indictment, information, or other formal charge. . . ." 404 U.S. at 320–21, 92 S.Ct. at 463.

Reiterating these principles in *Dillingham v. United States*, 423 U.S. 64, 96 S.Ct. 303, 46 L.Ed.2d 205 (1975), the Court held that even when the defendant has not shown actual prejudice, the time elapsing between arrest and indictment must be considered in appraising the alleged denial of a speedy trial. It is, therefore, essential to determine whether MacDonald's military arrest "engage[d] the particular protections of the speedy trial provision of the Sixth Amendment." *Marion*, 404 U.S. at 320, 92 S.Ct. at 463.

■ On May 1, 1970, MacDonald's commanding officer charged under oath that MacDonald, acting with premeditation, murdered his wife and two daughters. Simultaneously, the commanding officer

---

**7.** In its order denying MacDonald's motion, the district court said:

"By this motion [to dismiss the indictment for denial of the right to speedy prosecution and trial] the defendant takes the government to task for pre-indictment delay amounting to almost five years between the date of the crime on February 17, 1970, and the return of the indictment by the grand jury on January 25, 1975. The government has undertaken to justify the delay on the grounds that 'because of government bu-

reaucracy' the facilities of the crime laboratory of the Federal Bureau of Investigation were not brought into the case until the grand jury was finally convened in August of 1974. The right to a speedy trial under the Sixth Amendment does not arise until a person has been 'accused' of a crime, and in this case this did not occur until the indictment had been returned. On the authority of *United States v. Marion*, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971), the motion of defendant is denied."

recommended trial by general court-martial.[8] The charge was the functional equivalent of a civilian arrest warrant, for under U.C.M.J. Article 10, 10 U.S.C. § 810, it subjected MacDonald to arrest or confinement.[9] Like its civilian equivalent, military arrest must be based on probable cause.[10] The status of an officer restricted to quarters under arrest differs from that of one who is simply restricted to quarters in lieu of arrest. The distinction depends on whether the accused is relieved of his military duties. He is considered to be restricted under arrest if relieved of his duties, and in lieu of arrest if he is not.[11] Because MacDonald was relieved of his duties, he was restricted to quarters under arrest.

As the government's counsel acknowledged at oral argument, had MacDonald been an enlisted man, he probably would have been confined in a stockade. While his restriction to the bachelor officers' quarters was undoubtedly more comfortable and less confining than imprisonment in a guard house, it was nevertheless a public act that seriously interfered with his liberty. He was relieved of his duties, his phone calls were logged by a military policeman, and he was placed under the surveillance of an escort officer whenever he left his quarters.

The government relies on *Wales v. Whitney,* 114 U.S. 564, 5 S.Ct. 1050, 29 L.Ed. 277 (1885), to support its argument that MacDonald's status was not analogous to that of a civilian who has been arrested. In *Wales,* the Medical Director of the Navy, who had been placed under arrest and restricted to the city of Washington, D.C., pending court-martial, sought a writ of habeas corpus to test the jurisdiction of the military court. The Supreme Court, noting that Washington was his place of duty, observed that "[i]t is not easy to see how he is under any restraint of his personal liberty, by the order of arrest, which he was not under before." The Court held that the physical restraint of the Medical Director was insufficient as a matter of fact, and the moral restraint imposed by the order was insufficient as a matter of law, to justify issuance of the writ. In reaching this conclusion, the Court pointed out that other procedures allowed the Medical Director to challenge the military court's jurisdiction, and consequently the denial of his petition did not deprive him of an adequate remedy.

We find the government's attempt to equate MacDonald's situation to Wales' unpersuasive. MacDonald's arrest is distinguished from Wales' by the greater limita-

---

8. U.C.M.J. Art. 30, 10 U.S.C. § 830, provides:
 "(a) Charges and specifications shall be signed by a person subject to this chapter under oath before a commissioned officer of the armed forces authorized to administer oaths and shall state—
 (1) that the signer has personal knowledge of, or has investigated, the matters set forth therein; and
 (2) that they are true in fact to the best of his knowledge and belief.
 "(b) Upon the preferring of charges, the proper authority shall take immediate steps to determine what disposition should be made thereof in the interest of justice and discipline, and the person accused shall be informed of the charges against him as soon as practicable."

9. U.C.M.J. Art. 10, 10 U.S.C. § 810, provides:
 "Any person subject to this chapter charged with an offense under this chapter shall be ordered into arrest or confinement, as circumstances may require; but when charged only with an offense normally tried by a summary court-martial, he shall not ordinarily be placed in confinement. When any person subject to this chapter is placed in arrest or confinement

prior to trial, immediate steps shall be taken to inform him of the specific wrong of which he is accused and to try him or to dismiss the charges and release him."

10. U.C.M.J. Art. 9, 10 U.S.C. § 809, provides:
 "(a) Arrest is the restraint of a person by an order, not imposed as a punishment for an offense, directing him to remain within certain specified limits. Confinement is the physical restraint of a person.

 . . . .

 "(c) A commissioned officer, a warrant officer, or a civilian subject to this chapter or to trial thereunder may be ordered into arrest or confinement only by a commanding officer to whose authority he is subject, by an order, oral or written, delivered in person or by another commissioned officer. The authority to order such persons into arrest or confinement may not be delegated.
 "(d) No person may be ordered into arrest or confinement except for probable cause."

11. *See* ¶ 20 *a* and *b*, Manual for Courts-Martial (U.S. 1969 rev. ed.).

tions placed on his liberty. Apart from this, "[n]otions of custody have changed" since 1885, *Strait v. Laird,* 406 U.S. 341, 351, 92 S.Ct. 1693, 32 L.Ed.2d 141 (1972) (Rehnquist, J., dissenting), and *Wales'* custody requirement for a writ of habeas corpus "may no longer be deemed controlling." *Hensley v. Municipal Court,* 411 U.S. 345, 350 n. 8, 93 S.Ct. 1571, 1574, 36 L.Ed.2d 294 (1973).

In any event, the standard employed by the Court in *Wales* to evaluate a restraint of liberty for the procedural requirements of habeas corpus provides an unsatisfactory measure to test the denial of the sixth amendment's guarantee to a speedy trial. The appropriate test is found in *Marion,* not *Wales.* MacDonald was subjected to "actual restraints imposed by arrest and holding to answer a criminal charge." *Marion,* 404 U.S. at 320, 92 S.Ct. at 463.[12] It is these circumstances, as the Court points out, "that engage the particular protections of the speedy trial provision of the Sixth Amendment." *Marion,* 404 U.S. at 320, 92 S.Ct. at 463. We conclude, therefore, that MacDonald's military arrest was the functional equivalent of a civilian arrest allowing him to invoke the sixth amendment's guarantee of a speedy trial.

For the purpose of determining whether the sixth amendment applies, it is immaterial that, although the Army initially accused and arrested MacDonald, the civilian arm of the government is currently prosecuting him.[13] The prosecution of the same charge—murder—that the Army began was pursued by the Department of Justice. The sixth amendment, we hold, secures an accused's rights to a speedy trial against oppressive conduct by the government in its single sovereign capacity, regardless of the number and character of the executive departments that participate in the prosecution.

MacDonald's freedom from detention or bail during the interval between the termination of the Article 32 proceedings and his arrest · after indictment did not, from a practical standpoint, dispel the effects of the government's initial accusation. MacDonald, of course, realized that the favorable conclusion of the Article 32 proceedings was not the end of the government's efforts to convict him. Prudence obliged him to retain attorneys at his own expense for his continuing defense.[14] He remained under suspicion and was subjected to the anxiety of the threat of another prosecution.

The absence of imprisonment or bail does not always render inoperative the constitutional guarantee of a speedy trial.[15]

---

**12.** The Assistant United States Attorney for the Eastern District of North Carolina, appearing for the government in the bail hearing before a magistrate for the United States District Court for the Central District of California, described MacDonald's status as follows:

"Back in the Article 32 hearing, he was in custody. He did have an officer with him, assigned to him, as Mr. Segal explained to you. He was, more or less, I believe they call it house arrest at the BOQ. And then, of course, once he was released on the charges, he was no longer required to have another Army officer with him. Shortly after that, he was discharged from the Service."

**13.** We agree with the government that Fed.R. Crim.P. 48(b) did not control the military proceedings against MacDonald and thus was not applicable to him until his arrest by civilian authorities, *cf. Boeckenhaupt v. United States,* 392 F.2d 24 (4th Cir. 1968).

**14.** MacDonald alleges that his legal expenses for contesting the Army proceedings against him and for retaining counsel since then amount to $50,000. He estimates that expenses of trial would amount to an additional $250,000.

**15.** Although the government acknowledges that the Speedy Trial Act of 1974 does not govern this case, it contends that the principles codified in 18 U.S.C. § 3161(h)(6) and its prototype, ABA, *Standards Relating to Speedy Trial* § 2.3(f) (App. draft 1968), should be applied to toll the running of time during the interval from the dismissal of the Army's charges against MacDonald in October 1970 to the return of the indictment in 1975. However, the tolling provision of § 3161(h)(6) must be read in conjunction with the entire Act, which sets fixed time limits after arrest, subject to certain exclusions, within which trial must take place. A single section of the Act should not be used outside of its statutory context as a standard for interpreting the sixth amendment, because the Act does not purport to mark the bounds of the sixth amendment's speedy trial clause. In

In *Klopfer v. North Carolina,* 386 U.S. 213, 87 S.Ct. 988, 18 L.Ed.2d 1 (1967), the Court held that the practice of nolle prossing an indictment with leave to reinstate it deprived an accused of his right to a speedy trial even though he was not confined or required to post bail. *Klopfer* differs from this case in one respect: there, an indictment remained potentially effective during the period of delay; here, MacDonald was not indicted until the end of the period. Apart from the absence of an indictment, MacDonald's situation bears a marked resemblance to Klopfer's. After formal arrest and charge, both men contested their accusations with the inconclusive result of Klopfer's mistrial and the dismissal of the charges against MacDonald after the Article 32 proceedings. The prosecution against both men, however, could have gone forward promptly—Klopfer's by retrial and MacDonald's by court-martial if the commanding general had rejected Colonel Rock's Article 32 report or if the United States Attorney had presented the case to a grand jury.[16] Nevertheless, neither man was held for trial. Consequently, Klopfer and MacDonald were free from imprisonment or the restraints of bail, but at all times they were subject to prosecution. Unlike defendants held pending trial, Klopfer and MacDonald were deprived of any forum in which to vindicate themselves. Most importantly, under the theory advanced by the state in *Klopfer* and by the federal government here, neither man would be safeguarded by the sixth amendment until the government, at its leisure, renewed the prosecution.

Speaking of the purposes of the sixth amendment's speedy trial provision, the Court said in *United States v. Marion,* 404 U.S. 307, 320, 92 S.Ct. 455, 463 (1971):

"Inordinate delay between arrest, indictment, and trial may impair a defendant's ability to present an effective defense.

But the major evils protected against by the speedy trial guarantee exist quite apart from actual or possible prejudice to an accused's defense. To legally arrest and detain, the Government must assert probable cause to believe the arrestee has committed a crime. Arrest is a public act that may seriously interfere with the defendant's liberty, whether he is free on bail or not, and that may disrupt his employment, drain his financial resources, curtail his associations, subject him to public obloquy, and create anxiety in him, his family and his friends. These considerations were substantial underpinnings for the decision in *Klopfer v. North Carolina* . . . .."

The considerations which the Court recognized as "substantial underpinnings" for affording Klopfer the protection of the sixth amendment apply also, we believe, to MacDonald, whose situation, viewed realistically, was similar to Klopfer's.

 The delay between the accusation and detention of MacDonald and his indictment was more than four and one-half years. The Court described a five-year delay as "extraordinary" in *Barker,* 407 U.S. at 533, 92 S.Ct. 2182, and in *United States v. Macino,* 486 F.2d 750 (7th Cir. 1973), a 28-month delay between arrest and indictment was considered excessive. We conclude, therefore, that the delay in MacDonald's case is sufficiently long to justify "inquiry into the other factors that go into the balance" of assessing MacDonald's claim that he has been denied a speedy trial. *Barker,* 407 U.S. at 530, 92 S.Ct. 2182.

*The reason for the delay. Barker* teaches that the weight to be given delay varies with the government's reasons. Deliberate delay to hamper the defense must be weighed heavily against the government, and valid reasons such as a missing witness serve to excuse the delay. Neither of these

contrast, *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), which eschews rigid time limits, provides the analysis which we must follow in determining whether the sixth amendment's guarantee has been violated.

16. U.C.M.J. Arts. 18, 32–34, 10 U.S.C. §§ 818, 832–34; ¶¶ 34 and 35 Manual for Courts-Martial (U.S.1969 rev. ed.); 18 U.S.C. §§ 1111 and 3231.

extremes applies to MacDonald's case, which appears to fall in a middle ground. Speaking of this, the Court said that a "neutral reason such as negligence or overcrowded courts should be weighed less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant." 407 U.S. at 531, 92 S.Ct. at 2192.

■ There are several identifiable phases of delay and the reasons for them differ. During the initial period, the 1970 Army investigation and Article 32 proceeding, MacDonald was being prosecuted, so the inaction of civilian authorities was justified. For the next 18 months, at the request of the Department of Justice, the CID conducted another extensive investigation. Since the charges had been previously dismissed for insufficient evidence, the civilian prosecutors understandably desired a new investigation before bringing MacDonald to trial. The investigators were not dilatory and the case is complex, so this delay should not be weighed heavily against the government. *See Barker,* 407 U.S. at 531, 92 S.Ct. 2182.

■ The CID's report, along with its recommendation to prosecute, was transmitted to the Department of Justice in June 1972, more than two years before the commencement of grand jury proceedings. The government has not provided any satisfactory explanation for this two-year hiatus.

It suggests that the need for further investigation and for its attorneys to become familiar with the case justifies the delay. But no significant new investigation was undertaken during this period, and none was pursued from August 1973 until the grand jury was convened a year later. Moreover, the United States Attorney was familiar enough with the case to recommend prosecution and specify his need for an additional attorney in the summer or fall of 1973. There is no indication in the record that the delay during this period was "inevitable" because of "[c]rowded dockets, the lack of judges or lawyers," or any other factor which might mitigate the government's failure to bring MacDonald to trial promptly after the CID completed its report in June 1972. *See Dickey v. Florida,* 398 U.S. 30, 38, 90 S.Ct. 1564, 26 L.Ed.2d 26 (1970). The leisurely pace from June 1972 until the indictment was returned in January 1975 appears to have been primarily for the government's convenience.[17] The Assistant United States Attorney for the Eastern District of North Carolina, who is familiar with the case, expressed an even harsher assessment of the delay. He told the magistrate at the bail hearing that the tangible evidence had been known to the government since the initial investigation in 1970 but that it had not been fully analyzed by the F.B.I. until the latter part of 1974. He explained that the F.B.I. analysis was tardy "because of government bureaucracy."[18] Whether one attributes the delay

---

17. The government may have proceeded on the erroneous assumption that no matter how much time elapsed between prosecutions, the pre-indictment delay would be of no consequence. But a mistake of law affords no justification for depriving an accused of sixth amendment rights. *Dickey v. Florida,* 398 U.S. 30, 90 S.Ct. 1564, 26 L.Ed.2d 26 (1970).

18. During the course of the government's summation at the bail hearing, the Assistant United States Attorney and the Magistrate engaged in the following colloquy:

ASSISTANT UNITED STATES ATTORNEY: Your Honor, there is, I am sure, some question about the five-year period of time in here. This case has been investigated over a five-year period of time. It was not until very recently that the FBI Laboratory came into the case. Previ-

ously, the investigation of the case from a scientific viewpoint was by the Army CID Lab.

At the time of the Article 32 hearing in 1970 when Dr. MacDonald was released from the Army charges, much of the scientific evidence that I've made available to you today was not available to the hearing officer at that time.

THE MAGISTRATE: But this evidence has been gone over—this evidence is four or five years old now . . .

ASSISTANT UNITED STATES ATTORNEY: Yes. The evidence with regard to the pajama top, the bath mat and the sheet: All that evidence has been produced within the last five months by the FBI Lab.

THE MAGISTRATE: But that evidence—the analysis of that evidence was within the last five months, is that correct?

from mid-1972, when the CID recommended prosecution, until the indictment was returned in January 1975 to indifference, negligence, or ineptitude, it must be weighed against the government. *Barker,* 407 U.S. at 514, 92 S.Ct. 2182; *Dickey v. Florida,* 398 U.S. 30, 90 S.Ct. 1564, 26 L.Ed.2d 26 (1970). We turn, therefore, to the third factor prescribed by *Barker,* an appraisal of MacDonald's conduct.

*The defendant's assertion of his right.* In *Barker* the Supreme Court observed that some defendants may wish to delay trial in expectation of the prosecution's case becoming stale. 407 U.S. at 521, 92 S.Ct. 2182. At the same time, it rejected a strict "demand-waiver" approach that requires a defendant to assert the right or lose it. 407 U.S. at 524–29, 92 S.Ct. 2182. It recognized, however, that an important factor in deciding a claim that a defendant has been denied a speedy trial is whether he wanted one and made his demands known to the prosecution. 407 U.S. at 531–32, 92 S.Ct. 2182.

MacDonald has by no means delayed the prosecution of his case. While he was in the Army, and afterwards, he gave statements to the CID. He testified under cross-examination in the Article 32 hearing and offered to submit himself to questioning by attorneys in the Department of Justice. Additionally, he waived immunity and testified before the grand jury.

MacDonald also has consistently expressed a desire to have the case resolved. He first attempted to expedite a decision in January 1972. Later, his attorneys wrote the department several letters inquiring about a final decision on the prosecution to relieve "the unfounded suspicion" to which

MacDonald was subjected.[19] A person in his position who has been arrested but not indicted is under no compulsion to demand prosecution in order to preserve his right to a speedy trial, for the primary responsibility for bringing cases to trial rests on the government. *United States v. Macino,* 486 F.2d 750 (7th Cir. 1973); *cf. Barker,* 407 U.S. at 529, 92 S.Ct. 2182. Both the facts and the law, therefore, warrant the conclusion that MacDonald reasonably asserted his right to a speedy trial. In accordance with *Barker,* his assertion "is entitled to strong evidentiary weight in determining whether [he] is being deprived of the right." 407 U.S. at 531–32, 92 S.Ct. 2182, 2192.

*Prejudice to the defendant.* An affirmative demonstration of prejudice is unnecessary to prove a denial of the right to a speedy trial. It is, however, one of the factors a court must weigh in adjudicating the accused's claim. *Moore v. Arizona,* 414 U.S. 25, 94 S.Ct. 188, 38 L.Ed.2d 183 (1973); *Barker,* 407 U.S. at 533, 92 S.Ct. 2182. The Court has said the sixth amendment's guarantee of a speedy trial is "an important safeguard to prevent undue and oppressive incarceration prior to trial, to minimize anxiety and concern accompanying public accusation and to limit the possibilities that long delay will impair the ability of an accused to defend himself." *United States v. Ewell,* 383 U.S. 116, 120, 86 S.Ct. 773, 776, 15 L.Ed.2d 627 (1966). Prejudice, therefore, should be assessed in the light of these interests. *Barker,* 407 U.S. at 532, 92 S.Ct. 2182.

MacDonald was not imprisoned or subjected to bail from October 1970 until January 1975, but his freedom to come and go is not decisive. An accused person who

---

ASSISTANT UNITED STATES ATTORNEY: Yes, sir. The evidence was in existence the whole time: The bloody sheet, the bath mat and the—

THE MAGISTRATE: The time—three to four years passed between the creation of the evidence and its analysis?

ASSISTANT UNITED STATES ATTORNEY: That's correct.

THE MAGISTRATE: Very well.

ASSISTANT UNITED STATES ATTORNEY: We were not—Because the FBI Lab, because of Government bureaucracy, did not come into the case, and we were unable to get them into the case until the beginning of this Grand Jury.

Prior to that time, the Army CID Lab out of Fort Gordon handled it, and they do not have the sophistication that the FBI Lab has, and they will admit that.

**19.** Extracts from some of the letters are quoted in notes 5 and 6 *supra.*

is not restrained may nonetheless be prejudiced. *Klopfer v. North Carolina*, 386 U.S. 213, 221, 87 S.Ct. 988, 18 L.Ed.2d 1 (1967). MacDonald has had to live with the constant threat of a new prosecution. He has been required to retain counsel at his own expense, and he has suffered anxiety concerning the unresolved nature of the case. These personal concerns are significant elements of prejudice. *United States v. Marion*, 404 U.S. 307, 320, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971).

Also, MacDonald's claim that his ability to defend himself has been impaired is not unfounded. Most of his witnesses who were in the Army in 1970 have scattered across the country. Even if the government provides the defense with current addresses, interviewing these witnesses before trial and insuring their presence at trial would be time-consuming and expensive. Moreover, in the five years since the murders, memories have faded and witnesses can no longer be expected to reliably recall details.

Such potential memory loss is critical in this case, since a detailed reconstruction of the murder scene is an element of the government's case. The position of a flowerpot, the way MacDonald's pajama top was folded, the condition of the sheets in the bedroom, are but examples of the many questions about physical evidence that the government's case turns on. In one instance, the government contended at the Article 32 hearing that an overturned coffee table lying on its side showed that the murder scene was staged, since the table was top-heavy and would have turned completely over if kicked in a scuffle. When the Article 32 officer visited the scene and kicked the table over, however, it struck a chair and landed on its side. Thus, the exact position of the chair is important in determining whether MacDonald staged the murders as the government charges.

The prosecution emphasizes that all of the testimony at the Article 32 hearing and the statements made to investigators since then have been kept and may be used to refresh memories. Yet this in itself illustrates the prejudice to MacDonald. A stale witness, forced to rely on statements made half a decade previously, cannot be as effective as one actually remembering what he saw. Since the details of any witness's testimony may change over five years, the adverse inference a jury might draw from the government's use of its old records to impeach defense witnesses cannot be overlooked.

In sum, applying the principles of *United States v. Marion*, 404 U.S. 307, 320–21, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971), we conclude that for the purposes of determining whether MacDonald was denied his right to a speedy trial, the Army's formal accusation and detention on May 1, 1970, entitled him to invoke the protection of the sixth amendment. *See Dillingham v. United States*, 423 U.S. 64, 96 S.Ct. 303, 46 L.Ed.2d 205 (1975). Weighing the factors specified by *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), we believe that the delay—even if the period from May 1, 1970, to June 30, 1972, is wholly excluded as excusable—was of sufficient length to be "presumptively prejudicial." 407 U.S. at 530, 92 S.Ct. 2182. The delay, therefore, necessitates inquiry into the other factors of the balance. The government has furnished no satisfactory explanation for the delay from the end of June 1972 until the grand jury was convened in August 1974, so this time must be weighed against it. MacDonald, on the other hand, neither contributed to this delay nor acquiesced in it, so his conduct weighs heavily in his favor. Finally, it is apparent from the record that MacDonald has been prejudiced by the formal accusation and arrest of May 1970, by anxiety arising out of the delayed resolution of this charge, and by the impediment to his defense that scattered witnesses and dimmed memories inevitably cause. Weighing all of these factors, we conclude that the government has denied MacDonald a speedy trial as guaranteed by the sixth amendment and that the prosecution must be dismissed. *Strunk v. United States*, 412 U.S. 434, 93 S.Ct. 2260, 37 L.Ed.2d 56 (1973).

## IV

We find no error in the district court's rulings concerning the composition of the grand jury, alleged prosecutorial misconduct, and the denial of motions for discovery and suppression of evidence.

MacDonald claims that General Flanagan's acceptance of his exoneration in the Article 32 hearing collaterally estops the government from prosecuting him again. Alternatively, he argues that the second prosecution places him in double jeopardy. The government argues, however, that the Article 32 proceedings did not place MacDonald in jeopardy since only a court-martial, which was never convened, could have convicted him. Decision of this aspect of the case depends largely on the legal effect of the acceptance of an Article 32 recommendation by the commanding officer. It appears that custom imputes finality to the commanding officer's decision. This would arguably sustain a plea of collateral estoppel, if not double jeopardy, but no military regulation or case specifically deals with this question. In view of the unsettled state of this point of military law and of our disposition of the case under the speedy trial provision of the sixth amendment, we find it unnecessary and imprudent to render an opinion, which would in effect be advisory, on an issue of general importance to military law.

The case is remanded with directions to dismiss the prosecution with prejudice because of the government's failure to accord MacDonald a speedy trial as required by the sixth amendment.

CRAVEN, Circuit Judge (dissenting):

My brothers hold that the sixth amendment compels the dismissal of the *only* prosecution ever begun against Dr. MacDonald. One need know very little about military law to understand that a charge of homicide can be disposed of finally only by court-martial. None was ever convened. Instead, the Army, pursuant to Article 32, Uniform Code of Military Justice,[1] simply conducted a "thorough and impartial investigation" to determine whether the charge might be referred to a general court-martial, and concluded that the evidence was insufficient to justify the convening of a general court. It is true that the hearing was protracted and made newspaper headlines. But it is also true, it seems to me (my brothers do not reach the question), that Captain MacDonald has never been put to trial by either a civil or military court. What happened to him in the Army is the substantial equivalent of an open grand jury proceeding resulting in the failure to return a true bill, and that is all.[2]

My brothers hold that the sixth amendment's guarantee of the right to a speedy trial as interpreted by the Supreme Court

1. 10 U.S.C. § 832.

2. My brothers premise their analysis on an application of a civilian court of the sixth amendment speedy trial guarantee to events which occurred while MacDonald was in the military.

 That the sixth amendment's speedy trial guarantee applies to the military is an appealing *assumption* but should be recognized as such. The criminal trial provisions of both the fifth and sixth amendments are clearly aimed at procedure in the civil courts. The fifth expressly excludes cases arising in the land or naval forces from prosecutions requiring grand jury indictment, and it is settled that neither the fifth nor sixth amendments can "be taken to have extended the right to demand a jury to trials by military commission . . . ." *Ex Parte Quirin*, 317 U.S. 1, 40, 63 S.Ct. 1, 17, 87 L.Ed. 3 (1942). It is true that the Supreme Court once assumed the application of the dou-

ble jeopardy clause of the fifth amendment in a military context, but in doing so it is significant that it denied relief. *Wade v. Hunter*, 336 U.S. 684, 69 S.Ct. 834, 93 L.Ed. 974 (1949). I think my brothers' decision would rest on firmer ground if it were pitched on the fundamental fairness doctrine implicit in the due process clause, which has been applied time and again to an infinite variety of matters not restricted to criminal procedure in the civilian courts, as is, I think, the sixth amendment right to speedy trial. *See generally, O'Callahan v. Parker*, 395 U.S. 258, 272–73, 89 S.Ct. 1683, 23 L.Ed.2d 291 (1969); *Kinsella v. Krueger*, 351 U.S. 470, 474, 76 S.Ct. 886, 100 L.Ed. 1342 (1956); *Duncan v. Kahanamoka*, 327 U.S. 304, 309, 66 S.Ct. 606, 90 L.Ed. 688 (1946); *Burns v. Lovett*, 91 U.S. App.D.C. 208, 202 F.2d 335, 341–42 (1952), *aff'd sub nom., Burns v. Wilson*, 346 U.S. 137, 73 S.Ct. 1045, 97 L.Ed. 1508 (1953).

in *Marion*,[3] *Barker*,[4] and *Dillingham*,[5] is triggered by the Army proceedings. I think not and respectfully dissent.

## I.

In *Marion* the Supreme Court defined the point at which the sixth amendment becomes applicable:

On its face, the protection of the Amendment is activated only when a criminal prosecution has begun and extends only to those persons who have been "*accused*" in the course of that prosecution. These provisions would seem to afford no protection to those not yet accused, nor would they seem to require the Government to discover, investigate, and accuse any person within any particular period of time.

404 U.S. at 313, 92 S.Ct. at 459 (emphasis added).

It is now settled that a civilian becomes an "accused" when he is arrested and charged with a crime. This is so, the Supreme Court tells us, because:

To legally arrest and detain, the Government must assert probable cause to believe the arrestee has committed a crime. Arrest is a public act that may seriously interfere with the defendant's liberty, whether he is free on bail or not, and that may disrupt his employment, drain his associations, subject him to public obloquy, and create anxiety in him, his family and his friends.

*Marion, supra* at 320, 92 S.Ct. at 463. *See Dillingham v. United States*, 403 U.S. 64, 96 S.Ct. 303, 46 L.Ed.2d 205 (1975) (quoting *Marion*).

Thus, "it is either a formal indictment or information or else the actual restraints imposed by arrest and holding to answer a criminal charge that engage the particular protections of the speedy trial provision of the Sixth Amendment." *Dillingham, supra; Marion, supra.*

It is significant to me that the Court equates "either a formal indictment . . . or else the actual restraints imposed by arrest . . . to answer a criminal charge . . . ." It does *not* suggest that the amendment is triggered when the prosecutor presents the bill to the grand jury. Instead, the period of time for measuring the speed of the trial runs from the return of a true bill into the court. Charge is not enough. At most, Dr. MacDonald was "charged." Also, under the specific language of *Marion*, I do not believe the sixth amendment's speedy trial guarantee would be brought into play by an arrest without warrant by a federal drug enforcement officer, for example, if, upon presentation to a magistrate, the arrestee were released because no probable cause was shown. I do not believe my brothers would contend otherwise.[6]

My analysis of the facts of this case is that the procedure in which MacDonald was involved falls somewhere between an unsuccessful presentation to a grand jury and an arrest and subsequent release because of a failure to demonstrate probable cause for the arrest. Neither, I believe, warrants an application of the sixth amendment's speedy trial guarantee.[7]

MacDonald was charged with the murder of his wife and children by Colonel Francis Kane, his immediate commander. These charges were preferred under Article 30,

3. *United States v. Marion*, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971).

4. *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972).

5. *Dillingham v. United States*, 403 U.S. 64, 96 S.Ct. 303, 46 L.Ed.2d 205, 44 U.S.L.W. 3327 (U.S., Dec. 1, 1975).

6. I note that Dillingham was arrested on a warrant. *United States v. Palmer*, 502 F.2d

1233, 1234 (5th Cir. 1974), *rev'd sub nom. Dillingham v. United States*, 403 U.S. 64, 96 S.Ct. 303, 46 L.Ed.2d 205, 44 U.S.L.W. 3327 (1975).

7. This case differs from both my examples in that during these proceedings MacDonald was neither as free from restraints as a person under grand jury investigation nor as restricted as someone under civilian arrest. *See* part II, *infra.*

U.C.M.J.[8] That article makes clear that a finding of "probable cause" is not required to "charge" an individual under the Code.[9] Indeed, anyone subject to the U.C.M.J. can prefer charges against anyone else who is also under the Code.[10] A determination of probable cause, or its "functional equivalent," is only made under military procedure at the Article 32 proceedings.[11]

In MacDonald's case, at the close of the Article 32 proceedings Major General Edward M. Flanagan, Jr., acting on the report of Colonel Warren V. Rock, who presided at those proceedings, dismissed the charges because "[i]n [his] opinion, there [was] insufficient evidence available to justify reference of the charges to trial by court-martial."

It is therefore clear that no finding of probable cause was made in Dr. MacDonald's case at the Article 32 proceedings. My brothers are of the view, however, that we should presume such a finding was made because it should have been made prior to "arrest" under 10 U.S.C. § 810.

Whether a finding of probable cause was made is a question of fact. If there were such a finding I should think it would be supported by the record, but the majority makes no reference to any orders, either written or oral, to indicate that a finding of probable cause was made. We are not told when the finding was made, who made it, or what procedures he followed in doing so. Instead, as I have said, a presumption is created.

First, my brothers reason that since MacDonald was relieved of his duties, his status must be that of "arrest" rather than "restriction to quarters in lieu of arrest." Secondly, they correctly note that under 10 U.S.C. § 810 MacDonald was subject to arrest or confinement when charged with the murders by Colonel Kane on May 1. And finally, they infer that since 10 U.S.C. § 809 purports to require that all arrests be supported by probable cause that probable cause must have been found in MacDonald's case.

I do not believe it is necessarily the case that because MacDonald was relieved of his duties, he was arrested. I read Paragraphs 20a and b of the Manual for Courts-Martial only to say that an officer under "arrest" may not be required to perform his duties and that an officer restricted to quarters in lieu of arrest may be required to do so. These two provisions do not forbid the Army from relieving one restricted to his quarters of any or all of his duties. That MacDonald was relieved of all duties is not, I believe, conclusive as to this status.

I agree with my brothers, as I have previously said, that MacDonald was subject to arrest or confinement under 10 U.S.C. § 810 when charged with homicide. But I cannot agree that the power to do a thing requires a finding that it was done. Whatever the logic of such a presumption, I believe Paragraph 18b of the Manual of Courts-Martial destroys it for that paragraph explicitly states that the arrest and confinement pro-

8. 10 U.S.C. § 830.

9. Article 30 reads as follows:
 (a) Charges and specifications shall be signed by a person subject to this chapter under oath before a commissioned officer of the armed forces authorized to administer oaths and shall state—
 (1) that the signer has personal knowledge of, or has investigated, the matters set forth therein; and
 (2) that they are true in fact to the best of his knowledge and belief.
 (b) Upon the preferring of charges, the proper authority shall take immediate steps to determine what disposition should be made thereof in the interest of justice and discipline, and the person accused shall be

informed of the charges against him as soon as practicable.

10. ¶ 29b, Manual for Courts-Martial (U.S. 1969 rev. ed.).

11. Article 32, 10 U.S.C. § 832 reads in relevant part:
 (a) No charge or specification may be referred to a general court-martial for trial until a thorough and impartial investigation of all the matters set forth therein has been made. This investigation shall include inquiry as to the truth of the matter set forth in the charges, consideration of the form of charges, and a recommendation as to the disposition which should be made of the case in the interest of justice and discipline.

visions, although couched in terms of requirements, are "not mandatory and [their] exercise rests within the discretion of the person vested with the power to arrest or confine." [12]

I think the Manual of Courts-Martial will take us just so far and that we are driven back to the facts, and the facts are that Dr. MacDonald was verbally restricted to quarters by Colonel Kane on April 6, 1970, and there is nothing whatsoever in the record to suggest any change in his status when he was formally charged on May 1. If MacDonald was ever arrested it must have been on April 6 when he was first restricted to quarters and his duties lifted, and on that date I do not believe that anyone suggests the existence of probable cause for arrest, let alone a specific finding to that effect.[13]

My brothers and I agree, I think, that arrest without more is not enough to trigger the sixth amendment. There must be a lawful arrest, i. e., with probable cause. It is fair to say, I think, that there is not one word in the record to even suggest that anyone, much less the equivalent of an impartial magistrate, ever purported to find probable cause to arrest Dr. MacDonald. I believe we can be fairly sure that this is the first instance in the long history of the doctrine of probable cause in which a court has assumed that there must have been such a finding because it should have been made.

Finally, I cannot agree with my brothers that Colonel Kane's charge was the functional equivalent of a civilian arrest warrant. I am not sure to what it should be equated, but it is equally plausible to view it as the functional equivalent of the complaint of the prosecutor who then must seek an arrest warrant from an impartial magistrate.

Based on the above analysis I believe it is clear that a finding of probable cause was *never* made in Dr. MacDonald's case. Unless we ignore as surplusage the Supreme Court's language in *Marion*, which it repeated in *Dillingham*, that to "arrest and detain, the Government must assert probable cause to believe the arrestee has committed a crime," I do not understand how this case can be fitted within the rule of law established by those cases. Furthermore, I do not believe that the policy underpinnings of *Marion* allow us to ignore the significance of a finding of probable cause. The Supreme Court concentrated on the impact of the public act of arrest on the defendant. I believe that fundamental to that impact is the fact that, in the civilian arrest context with which *Marion* was concerned, an arrest must be supported by probable cause. With reference to public obloquy, contrast instead, what happened to Dr. MacDonald: after the equivalent of the return of "not a true bill," he was honorably discharged. I, therefore, think that Dr. MacDonald's case is clearly distinguishable from any of the cases cited by the majority.

My brothers find this case to closely parallel *Klopfer v. North Carolina*, 386 U.S. 213, 87 S.Ct. 988, 18 L.Ed.2d 1 (1967), differing from it in only one respect: "there an indictment remained potentially effective during the period of delay; here, MacDonald was not indicted until the end of the period." [14] I agree that that is the major difference between the cases, but I find the distinction to constitute the centerpiece of the Supreme Court's holding in that case

**12.** b. Basic considerations. (1) Any person subject to the code accused of an offense under the code shall be ordered into arrest or confinement, as circumstances may require; but when accused only of an offense normally tried by a summary court-martial, he shall not ordinarily be placed in confinement (Art. 10). The foregoing provision is not mandatory and its exercise rests within the discretion of the person vested with the power to arrest or confine. No restraint need be imposed in cases involving minor offenses. A failure to restrain does not affect the jurisdiction of the court.

**13.** All the majority tells us about that event is that on April 6 the CID informed MacDonald that "he was under suspicion." At 200. I find nothing in their treatment of this encounter nor anything in the record to indicate that on that day probable cause was found.

**14.** At 205.

that Klopfer's sixth amendment rights had been violated.

The pendency of the indictment may subject him to public scorn and deprive him of employment, and almost certainly will force curtailment of his speech, associations and participation in unpopular causes. By indefinitely prolonging this oppression, as well as the *"anxiety and concern accompanying public accusation,"* the criminal procedure condoned in this case by the Supreme Court of North Carolina clearly denied the petitioner the right to a speedy trial which we hold is guaranteed to him by the Sixth Amendment of the Constitution of the United States.

386 U.S. at 222, 87 S.Ct. at 993 (footnote omitted and emphasis added).

During this four-year period MacDonald stood under no "public accusation." The charges had been dismissed by the Army, and this action was made irrevocable by his discharge from the Army. I find this claim therefore to be one of double jeopardy, which I do not believe is meritorious, and which issue my brothers do not reach.

## II.

Under my brothers' reasoning, we must determine that military arrest is the functional equivalent of civilian arrest for the purposes of triggering the right to a speedy trial. I conclude that MacDonald was never "arrested" in the sense required under *Marion.*

MacDonald was restricted to his room in the Bachelor Officers' Quarters.[15] An armed MP was placed outside his door. An escort officer accompanied him when he left the quarters.[16] While *Wales v. Whitney,* 114 U.S. 564, 5 S.Ct. 1050, 29 L.Ed. 277 (1885) is, as my brothers say, no longer the law as to the degree of "confinement" necessary to support issuance of a writ of habeas corpus, I believe it is fully applicable to the majority's search for the functional equivalent of a civilian arrest. In that respect, I believe it is still sound precedent and demands a conclusion that MacDonald was not in a civilian sense under the "actual restraints required by arrest and holding to answer to a criminal charge."

In *Wales* a Navy officer who had been ordered to appear for trial at general court-martial was given the following order by the Secretary of the Navy: "You are hereby placed under arrest, and you will confine yourself to the limits of the City of Washington." 114 U.S. at 566, 5 S.Ct. at 1051. While the majority may be correct that the cases differ with respect to "the greater limitations placed on [MacDonald's] liberty,"[17] I believe, like those in *Wales,* the restraints imposed on MacDonald did not constitute "actual confinement or the present means of enforcing it." 114 U.S. at 572, 5 S.Ct. at 1053. The restraints were, under the Supreme Court's terminology, simply "moral." As I read *Wales,* the critical point was not that the petitioner in that case was free to walk the streets of Washington, D. C., alone. The Supreme Court focused on the fact that if he had wished to leave the District, he was free to do so, "[a]nd though it is said that a file of marines or some proper officer could have been sent to arrest, and bring him back, this

---

**15.** The majority opinion attaches significance to the fact that had MacDonald been an enlisted man he would have probably been confined in the stockade. At 203. The fact is that he was an officer and was not so confined.

**16.** The government describes MacDonald's restrictions as follows:

He was to remain in his room except when he was visiting his lawyers, dining at the officers club, or making parachute jumps for pay qualification purposes. The general, though unenforced, limitation on Captain MacDonald's movement was the requirement that he be accompanied by an escort officer while on post. He was permitted to sun bathe in the vicinity of the BOQ, to play golf on post, to attend the post chapel as well as the post theatre, post liquor (Class VI) store, commissary, post exchange and the bowling alley.

Brief for Appellee at 5–6.

In the context of the military where a person is subject normally to the orders of his superiors, I do not find this the type of serious "interfere[nce] with his liberty" which I believe brings the right to speedy trial into play.

**17.** At 203–204.

could only be done by another order of the secretary, and would be another arrest, and a real imprisonment under another distinct order." 114 U.S. at 572, 5 S.Ct. at 1054.

Neither side has provided this court with the orders directed to MacDonald or others concerning his restriction to quarters. At oral argument, however, we were told by the government attorney arguing the case that the MP stationed outside MacDonald's door was given specific instructions *NOT* to stop him if he tried to leave. The escort officer who accompanied MacDonald, according to my understanding of the facts, was not armed. I find nothing in the record to indicate that his orders included a direction to stop MacDonald from any conduct he undertook. I therefore find the present case indistinguishable from *Wales*. Any actual confinement would have required an additional order, and there was therefore no "actual confinement or the present means of enforcing it." *Wales, supra* at 572, 5 S.Ct. at 1053.

### III.

Having concluded that the sixth amendment's guarantee of speedy trial does not apply in MacDonald's case, he may still prevail if it were found that the delay violated his right to due process under the fifth amendment. *See, e. g., Marion, supra*, 404 U.S. at 324, 92 S.Ct. 455; *Ross v. United States*, 121 U.S.App.D.C. 233, 349 F.2d 210 (1965). But to grant relief under the fifth amendment requires a showing of substantial prejudice, and I find none. *Id.*

The majority finds prejudice in the fact that MacDonald's witnesses, as Army personnel, have scattered around the world with resulting difficulty in locating them and conducting pretrial interviews. In addition, my brothers agree with MacDonald's argument that the memories of these witnesses will be dulled by time. But all that is speculative. In a wholly circumstantial type of case, it is improbable that guilt or innocence will turn upon accurate recollection of the facts. It is not suggested that any defense witness who knows the truth

now cannot be produced, or if found, cannot now remember what he once knew.

But if it be assumed that these factors may supply the requisite prejudice under the sixth amendment's more specific guarantees, I do not believe they require dismissal of the indictment under the fifth amendment's guarantee of due process. Certainly that question need not be anticipated, and could best be left for determination at trial.

I would affirm.