**UNITED STATES of America, Appellee,**

v.

**Jeffrey R. MacDONALD, Appellant.**

**No. 79–5253.**

United States Court of Appeals,
Fourth Circuit.

Argued Feb. 5, 1980.

Decided July 29, 1980.

Rehearing Denied Dec. 18, 1980.
See 635 F.2d 1115.

Ralph S. Spritzer, Philadelphia, Pa., Bernard L. Segal, San Francisco, Cal. (Wendy

**260**

P. Rouder, San Francisco, Cal., Michael J. Malley, Washington, D.C., Wade M. Smith, Raleigh, N.C., on brief), for appellant.

Brian M. Murtagh, Dept. of Justice, Washington, D.C., James L. Blackburn, Asst. U. S. Atty., Raleigh, N.C. (Patricia L. Holland, Atty., Dept. of Justice, George M. Anderson, U. S. Atty., Raleigh, N.C., on brief), for appellee.

Before BRYAN, Senior Circuit Judge and MURNAGHAN and SPROUSE, Circuit Judges.

MURNAGHAN, Circuit Judge:

■ Jeffrey R. MacDonald appeals convictions for second degree murder of his wife and one of his children and first degree murder of his other child. He has raised a number of issues as to the conduct of the trial and the rulings at trial by the district judge. He has also contended that his Sixth Amendment guarantee of speedy trial had been violated, and that there was delay so inexcusable and prejudicial as to have denied him the due process mandated by the Fifth Amendment.

Deciding as we do that MacDonald is correct on his Sixth Amendment contention, we do not reach the district judge's conduct and rulings at trial or the Fifth Amendment issue. With respect to the district judge's conduct and rulings at trial, it suffices to note that the case was a sensational, drawn-out one, both hotly contested and bristling with difficult issues. The district judge's handling of the heavy demands placed on him was admirable.

MacDonald's due process contention would require a demonstration that the delay was inexcusable and that actual prejudice occurred. *United States v. Lovasco*, 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977). The requisite proof to make out a Sixth Amendment violation is no greater, and, if anything, on the facts of this case would be less, than that required to establish a Fifth Amendment violation. Under either amendment, unreasonable delay, covering essentially the same time frame must be shown. The presence of the probability of prejudice completes the necessary proof under the Sixth Amendment; the actuality of serious prejudice must be made out to validate a claim of denial of due process. Consequently, as the burden on MacDonald to show an abuse of constitutional proportions under the Sixth Amendment could not be greater than his burden under the Fifth Amendment, there is no occasion to address the due process argument.

The Supreme Court, in recent years has provided specific criteria for the balancing tests necessary to determine a Sixth Amendment speedy trial issue. In *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), the Court said:

We can do little more than identify some of the factors which courts should assess in determining whether a particular defendant has been deprived of his right. Though some might express them in different ways, we identify four such factors: Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant.

*Id.* at 530, 92 S.Ct. at 2192.

In the same opinion, the Court identified three of the interests against which prejudice is measured:

This Court has identified three such interests: (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired. Of these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system.

*Id.* at 532, 92 S.Ct. at 2193.

On MacDonald's Sixth Amendment claim, we do not write on a clean slate. Prior to trial, MacDonald took an interlocutory appeal, and succeeded on the speedy trial issue, only to have the victory evaporate when the Supreme Court determined that, procedurally the matter was not ripe for review prior to trial. *United States v. MacDonald*, 531 F.2d 196 (4th Cir. 1976) (opinion by Butzner, J., joined by Russell, J.; Craven, J., dissenting), *reversed on prematurity grounds*, 435 U.S. 850, 98 S.Ct. 1547, 56

L.Ed.2d 18 (1978), [hereafter *MacDonald, First*].

Now, following trial and conviction, we are called upon again to address the question answered in MacDonald's favor by this Court in 1976.

The United States advances the argument that all of the criteria announced in *Barker* must be viewed in a different light from that in which the criteria were considered in this Court's 1976, *MacDonald, First* opinion. The reason, it contends, is that there has been a jury trial in the interim, and the facts developed at trial bear on the issues created by the four *Barker* factors.

The United States is only partially correct. The questions necessarily posed by the first three *Barker* factors were in the same posture both before and after trial. It is only the fourth factor, the question of prejudice, that must be viewed differently.

Since the Court's admirable resolution of these issues has not been affected by the facts developed at the intervening trial, we adopt the reasoning of *MacDonald, First* on the issues concerning the effect of the length of delay; the government's reason for the delay; and MacDonald's assertion of his right.

### Length of Delay

 The offending delay imposed by the government was not the time between the indictment and trial, but the lapse of time between the military arrest and trial. The military arrest was equivalent to civilian arrest and MacDonald was "subjected to 'actual restraints imposed by arrest and holding to answer a criminal charge.'" 531 F.2d at 204. It is inconsequential that the delay was the result of the accumulative action by a military and a civilian arm of government. "The sixth amendment, we hold, secures an accused's rights to a speedy trial against oppressive conduct by the government in its single sovereign capacity, regardless of the number and character of the executive departments that participate in the prosecution." *Id.*

The government argues that *MacDonald, First* was incorrect in stating that a 13-volume report of the Army's Criminal Investigation Detachment forwarded by the CID to the Justice Department in June, 1972, was accompanied by a recommendation of prosecution. However, the United States Attorney for the Eastern District of North Carolina made the recommendation that the matter be submitted to a grand jury within six months of June, 1972, yet nothing occurred until presentation to a grand jury began in August, 1974. In the interval the CID filed two supplemental reports analyzing the significance of physical evidence recovered at the scene of the crime on or shortly after February 17, 1970, the date of the tragic occurrence. The CID had balked at a request by the Justice Department for an additional investigation, suggesting instead the convening of a grand jury.

 Viewing the situation as a whole, the unwarranted bureaucratic delay which *MacDonald, First* found had taken place is fully established regardless of the fact that a suggestion of grand jury presentation came from the CID, not in June 1972, but at some later time. The Justice Department was in possession of all the evidence from June 1972, and that is what is determinative as to the excessiveness of delay, not whether it had advice from some other government agency to take the step which is committed to it by law, and for which it is particularly equipped to make the requisite decision.

The government also has argued that the reasoning of Judge Butzner's opinion in *MacDonald, First* may not stand in light of the subsequent holding by the Supreme Court in *United States v. Lovasco*, 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977). However, that case involved facts different in a determinative way from those presented in the instant case. Lovasco's involvement in crime came to the government's attention almost immediately, just as in MacDonald's case. Yet there are two vital distinctions. First, a postal inspector's report was prepared linking Lovasco to the offenses one month after they were com-

mitted. In MacDonald's case over two years elapsed before the CID completed its report and forwarded it to the Justice Department. Seventeen months after the postal inspector's report was prepared, Lovasco was indicted. Prior to that time, there had been no arrest, no attendant publicity prior to the indictment. Thus, there was a second distinction of controlling importance between Lovasco's case and MacDonald's. MacDonald had been subjected to the interference with his life and affairs of the Army's arrest and investigation under conditions of extremely intrusive publicity. Lovasco was put to no similar interference prior to his indictment. As a consequence, the Supreme Court held in *Lovasco* that there was presented no viable speedy trial claim under the Sixth Amendment,[1] and turned its attention solely to the alternative assertion: that due process guaranteed by the Fifth Amendment had been denied. In MacDonald's case there was the kind of "arrest and holding to answer a criminal charge" which brings the Sixth Amendment into play. 531 F.2d at 202–04.

■ Thus, pre-indictment delay was deemed altogether irrelevant under the Sixth Amendment in *Lovasco*, whereas, being post-arrest in MacDonald's case, as well as pre-indictment, it is relevant. But, if the 17 month delay in *Lovasco* had been relevant, it was far more excusable than the delay of over two years in MacDonald's case. The latter was the product of sheer bureaucratic indifference and therefore weighs heavily against the government. In Lovasco's case there were other persons, whose involvement was evident, and whose likely criminality was apparent. Delay to explore possibilities of bringing the others to book contemporaneously with Lovasco was excusable. The investigation was properly describable as incomplete, and the

Supreme Court accepted that the need for more investigation and the actual conduct of more investigation were established. In MacDonald's case, on the contrary, no further investigation was undertaken. Internally, the government conducted tests on evidence already long since obtained at the scene of the crimes, and lawyers in the Justice Department vacillated over and postponed decision on whether to seek indictment.

As did the *MacDonald, First* panel, we conclude, therefore, that the delay in MacDonald's case is sufficiently long to justify "inquiry into the other factors that go into the balance of assessing MacDonald's claim that he has been denied a speedy trial."

### The Reason for the Delay

For eighteen months after the dismissal of the charges by the Army, the CID, at the request of the Justice Department, conducted another extensive investigation. The report was transmitted to the Department of Justice in June, 1972, more than two years before the commencement of grand jury proceedings. The primary reason for the two-year delay was either a disagreement between two groups in the Justice Department as to whether the case should be prosecuted, or just simple government bureaucracy (the contention of the involved Assistant U. S. Attorney). This latter two years is the most offending delay and certainly weighs heavily against the government in determining whether MacDonald's right to a speedy trial has been violated.

### The Defendant's Assertion of His Right

There is no question but that MacDonald vigorously pursued his right to a speedy disposition of the charges against him. He gave statements to the CID while still in the military and testified under cross-exam-

---

1. The Supreme Court stated: "In *United States v. Marion*, 404 U.S. 307, [92 S.Ct. 455, 30 L.Ed.2d 468] (1971), this Court considered the significance, for constitutional purposes, of a lengthy preindictment delay. We held that as far as the Speedy Trial Clause of the Sixth Amendment is concerned, such delay is wholly irrelevant, since our analysis of the language, history, and purposes of the Clause persuaded us that only 'a formal indictment or information or else the actual restraints imposed by arrest and holding to answer a criminal charge . . . engage the particular protections' of that provision. *Id.* at 320, [92 S.Ct. at 463]." 431 U.S. at 788–89, 97 S.Ct. at 2048.

ination at the military hearing. He waived immunity and testified before the grand jury when it was finally convened, and consistently, after his discharge, contacted the Justice Department in an attempt to expedite the resolution of his case. This is entitled to strong evidentiary weight in determining whether he has been deprived of his right to a speedy trial. *Barker, supra*, 407 U.S. at 532, 92 S.Ct. at 2192.

### Prejudice—The Fourth *Barker* Factor

The question of prejudice is, of course, viewed from a crucially different perspective after the trial of the case than was available prior to trial. Completed evidence presents a detailed picture from which the possibilities of prejudice can be gauged. "As is reflected in the decisions of this Court, most speedy trial claims, therefore, are best considered only after the relevant facts have been developed at trial. . . . Before trial, of course, an estimate of the degree to which delay has impaired an adequate defense tends to be speculative. . . ." *U. S. v. MacDonald*, 435 U.S. 850, 858, 98 S.Ct. 1547, 1551, 56 L.Ed.2d 18 (1978).

It is a rare case, however, where testimony will simplistically demonstrate that the defense has been hampered by the passage of time. The MacDonald prosecution and defense is no exception. The evidence at trial, if anything, confused rather than clarified the question of actual prejudice at trial. As a reviewing court, our task has been to carefully sift the record and balance the evidenced effects of delay with the other "speedy trial" rules of *Barker* and its progeny.

It has been urged that *MacDonald, First* misconceived the significance of certain physical evidence obtained at the murder scene: a flower pot, MacDonald's pajama

top and a coffee table. It is further insisted that, judging by what actually occurred at trial, and not by what was anticipated would occur at trial, those items were not utilized by the government in a manner unfairly prejudicial to MacDonald when the case was presented to the jury. However, those particular items were alluded to as "but examples of the many questions about physical evidence that the government's case turns on." 531 F.2d at 208. The particular differences between pre-trial expectations and the actualities of trial are insignificant in the total picture.

■ The government has contended that pre-trial concerns about the prejudice to MacDonald from the fading memories of witnesses and the necessity for them to rely on statements made half a decade previously have proved groundless in the actual event. The prosecutor, the contention runs, did not need to refresh recollections at trial by resort to the earlier-obtained witness statements. However, that is no adequate response. The risk to MacDonald was simply too great that, in preparations *prior to the testifying* of each witness, the prosecutors helped fill lacunae of recollection, and assured consistency of support for their theory of the case by reminding each witness of what he had said at the outset. The intervening period of over nine years rendered it virtually impossible for MacDonald to prove the recollections of each witness to see if they were fuller than or different from what he had stated when his statement was taken.[2] Such refurbishing and improvement of recollections are, it is true, *possible* even after the lapse of over nine years from the commission of the crimes to the trial of MacDonald. Some government witnesses did change their original stories.[3]

---

**2.** Not all of the nine year delay was attributable to the government, but all of it contributed to the fading of memories. Excluding the period until June 1972 when the CID investigation report reached the Justice Department, and the time following the January 1975 indictment, which MacDonald acknowledges did not constitute inexcusable delay (*see* 531 F.2d at 202), there were still more than two years in which essentially all that the government did was

debate, in a desultory way, whether to press for prosecution or to drop the case. That delay was unreasonable and inexcusable. It contributed to the dissipation of recollections. That consideration suffices to engage the speedy trial protection of the Sixth Amendment.

**3.** MacDonald has contended that those changes to his detriment were also prejudicial occurrences attributable to the undue passage of

Yet, in general, the likelihood is greatly diminished. The substantial possibility of prejudice is what controls; it is not incumbent on the defendant to prove that prejudice inescapably took place. *Cf. Moore v. Arizona*, 414 U.S. 25, 94 S.Ct. 188, 38 L.Ed.2d 183 (1973) (per curiam).[4]

In this regard, the loss of the testimony of Helena Stoeckley has been cited by MacDonald as the greatest prejudice to him occasioned by the undue passage of time. In a bizarre way, she had made remarks to others on several occasions in 1970, 1971 and 1979, which, while far from precise or complete, indicated that she was one of a group of intruders whose supposed entry into the MacDonald home and killing of his wife and children constituted the essential defense offered by MacDonald.

We do not agree that this was the greatest prejudice to the defense. Nevertheless, Stoeckley's statement on the stand at trial that she had no recollection of her whereabouts or activities during the critical period of midnight to 4:30 A.M. on the night of the crimes (although she remembered in detail events immediately prior and immediately subsequent to that crucial interval) had a great potential for prejudice to MacDonald, given the substantial possibility that she would have testified to being present in the MacDonald home during the dreadful massacre. The likelihood that Stoeckley would testify that she could not remember was inevitably increased by the passage of the period of inexcusable delay. The consequences of having put on a wit-

ness who was to have verified MacDonald's own version of a Manson-like intrusion, only to have her fail to do so, may well have been disastrous to the defense. The potential for the drawing of adverse inferences by the jury is palpable. Yet the difficulty may not be dismissed as one of the inescapable risks associated with any tactical decision taken at trial. If Stoeckley could have remembered and testified to the critical 4½ hours, her remarks to others created a substantial enough basis that one cannot fault the decision to put her on the stand. MacDonald was entitled to that tactical course without its efficacy's having been vitiated by inexcusable action of the government. Had Stoeckley testified as it was reasonable to expect she might have testified, the injury to the government's case would have been incalculably great. The possible reasons why Stoeckley did not so testify are several.[5] But the reason she asserted under oath was failure of memory. The government's inexcusable delay of over two years' duration cannot be eliminated as a potential—indeed a probable—cause of that memory lapse.

The consideration that Stoeckley had theretofore demonstrated a great unreliability would not render omission of such testimony harmless error, for it would have only created an issue of credibility for the jury on the central question of fact which it was called upon to resolve.[6] The present case did not present the situation of a witness who would of necessity have to have

---

time resulting from the government's delay. We need not explore the substantiality of that contention.

4. In *Barker v. Wingo*, 407 U.S. 514, 532, 92 S.Ct. 2182, 2193, 33 L.Ed.2d 101 (1972), Justice Powell identified as an interest of the defendant bearing on the existence of prejudice: "the *possibility* that the defense will be impaired."

5. A likely one is that she was not on the scene of the crimes at all. However, that possibility did not erase the potential prejudice to MacDonald, for it was only a possibility. It was also quite possible that she was present, and could have given evidence supportive of MacDonald's thesis that intruders killed his wife and daughters.

6. Efforts of MacDonald to supply the deficiency of Stoeckley's memory by introducing hearsay testimony from those she had told stories which placed her on the scene on the night of the crimes were thwarted by government objections sustained by the district judge on the basis of Fed.Rules of Evid. 403, 804(b)(3). We have no occasion to question the correctness of the judge's evidentiary rulings. With hindsight, however, the government prosecutors may rue having prevented curative action for one potentially devastating prejudicial consequence of the government's unwarranted delay and concomitant failure to move ahead in a fashion to insure to MacDonald a speedy trial.

ost.ightight.ᵗ

committed perjury, if allowed to testify, as would be the case with someone shown to have been in prison at the very time the events occurred about which he was to testify. Exclusion of testimony from such a source obviously would be proper. However, the possibility that Stoeckley was physically present at the scene was not ruled out. Questions as to reliability of her testimony went only to the weight—a matter for the jury—not to the impossibility of her having experienced what she was proffered to testify about—a matter for the court.

Nor does it suffice for the government to point out that the denial of Stoeckley's testimony to MacDonald *may not* have been attributable to the government's delay. The government makes reference to testimony from one of those to whom Stoeckley told a story seeming to implicate her that, within a week of the crimes, she was stating that her memory was essentially blank as to the crucial hours. Her memory has resembled a lightbulb not screwed tight, blinking on and off. Still, however much other possible explanations for her memory loss can be asserted, the unavoidable principle remains that passage of time generally tends to erase memory. While other factors may have contributed, the possibility, indeed the probability, that unreasonable delay was the cause cannot be excluded.

Although, in this important aspect, prejudice, the fourth *Barker* factor, we approach MacDonald's Sixth Amendment allegation from a different background than that available to this Court in *MacDonald, First, supra*, we are still of the opinion that viewed in the light of all the evidence developed at trial, there was substantial possibility that MacDonald's defense was prejudiced by the delay.

As stated, we need not base our conclusion of prejudice solely or principally on the failure of Stoeckley. A pertinent comment of Justice Powell in the *Barker* opinion is relevant to the testimony of each witness whose testimony was based on his investigation of the case more than five years before the trial: "Loss of memory, how-ever, is not always reflected in the record because what has been forgotten can rarely be shown." 407 U.S. at 532, 92 S.Ct. at 2193. *MacDonald, First* rested substantially on this general principle—of almost certain memory erosion in the cases of all witnesses where the case has the characteristics of this one. Facts adduced at trial did little to dispel this judgment.

■ The possibility of prejudice to the defense at trial, although important, is only one element of the prejudice that may be shown to sustain a Sixth Amendment attack. As Justice White stated in his concurring opinion in *Barker*:

> Only if such special considerations [those considerations presenting a pressing public need] are in the case and if they outweigh the inevitable personal prejudice resulting from delay would it be necessary to consider whether there has been or would be prejudice to the defense at trial. "[T]he major evils protected against by the speedy trial guarantee exist quite apart from actual or possible prejudice to an accused's defense." *United States v. Marion, supra*, at 320, 92 S.Ct. at 2195–2196.

*Barker, supra*, 407 U.S. at 537–38, 92 S.Ct. at 2195. It is significant that the full Court later quoted with approval Justice White's language preceding the above quotation:

> Moreover, prejudice to a defendant caused by delay in bringing him to trial is not confined to the possible prejudice to his defense in those proceedings. Inordinate delay,
>
> "wholly aside from possible prejudice to a defense on the merits may 'seriously interfere with the defendant's liberty, whether he is free on bail or not, and . . . may disrupt his employment, drain his financial resources, curtail his associations, subject him to public obloquy, and create anxiety in him, his family and his friends.' *United States v. Marion*, 404 U.S. 307, 320, [92 S.Ct. 455, 463, 30 L.Ed.2d 468] (1971). These factors are more serious for some than for others, but they are inevitably present in every case to some extent,

for every defendant will either be incarcerated pending trial or on bail subject to substantial restrictions on his liberty." *Barker v. Wingo, supra,* at 537, [92 S.Ct. at 2195] (White, J., concurring.) *Moore v. Arizona,* 414 U.S. 25, 94 S.Ct. 188, 38 L.Ed.2d 183 (1973) (per curiam). *See also Strunk, aka Wagner v. United States,* 412 U.S. 434, 439, 93 S.Ct. 2260, 2263, 37 L.Ed.2d 56 (1973) ("The speedy trial guarantee recognizes that a prolonged delay may subject the accused to an emotional stress that can be presumed to result in the ordinary person from uncertainties in the prospect of facing public trial . . . .").

It is also important to remember Justice Powell's admonition that the four *Barker* factors have "no talismanic qualities; courts must still engage in a difficult and sensitive balancing process." *Barker, supra,* 407 U.S. at 533, 92 S.Ct. at 2193.

■ The sensitive process of balancing is a task highly individualized by the circumstances of each prosecution. The amount of demonstrable trial prejudice which would be violative of MacDonald's right to a speedy trial is affected by his persevering five-year insistence that his case be resolved and by his open and aggressive participation in the investigatory process. Weighing heavily in the equation is the government's calloused and lackadaisical attitude which was solely responsible for at least the last two years of delay. To require a showing approximating actual prejudice would have the adverse effect of encouraging such irresponsible administration of criminal justice. Also included in this equation is the personal prejudice to the accused. Not only was he under a cloud of suspicion for five years prior to the trial, but the personal pressure and anxiety of a threatened prosecution for murder is demonstrated by the expense and

concern he expended in attempting to have the charges resolved.

The prosecution consisted solely of highly technical circumstantial evidence. The government had the great advantage of unlimited financial and personal resources, access to laboratory and other technical devices, presenting evidence by skilled technical witnesses upon whom the jury must principally rely.[7]

■ The required judicial balancing process necessary to determine a violation of the Sixth Amendment, speedy trial requirements has been particularly difficult. It is made more difficult by the terrible crime and by the fact that a jury has found MacDonald guilty after a protracted trial. The vital balancing, however, tips the scales decisively in favor of finding a violation by the government of MacDonald's Sixth Amendment rights. We cannot and do not assess the correctness of the jury's verdict, and regardless of that we certainly cannot let such considerations condone or establish a prosecutorial method of obtaining convictions in violation of the fundamental constitutional right of future generations.

■ Under the Sixth Amendment, a showing of unreasonable delay, plus substantial proof of prejudice, mandates a holding that the constitutionally guaranteed speedy trial has been denied. *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). For Fifth Amendment purposes there must be a determination that the prejudice was so extreme as to amount to violation of "those 'fundamental conceptions of justice which lie at the base of our civil and political institutions,' . . . and which define 'the community's sense of fair play and decency,'" *United States v. Lovasco,* 431 U.S. at 790, 97 S.Ct. at 2049. Under the Fifth Amendment, proof of prej-

---

7. In one sense such technical circumstantial evidence is easier to preserve during a delay, but in another sense, after five years it is easier to orchestrate an array of technical evidence. The technical witnesses frequently are relying on scientific speculation and trial and error. An example important to his case is the testimony concerning the way in which a pajama top was folded over the deceased wife. The testimony was deduced years after the crime by matching numerous ice pick holes in the garment. This testimony was calculated to demonstrate that this stabbing was arranged after her death in order to simulate an intruder's attack.

udice is generally a necessary, but it may not be a sufficient element of a due process claim. The test, as to prejudice, for Sixth Amendment purposes is not so stringent. *Barker v. Wingo*, 407 U.S. 514, 532, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). The fact that the delay was undue and resulted in prejudice suffices in MacDonald's case, whether or not the delay and consequent prejudice were so egregious as to amount to deviation from "fundamental conceptions of justice." The extensive discussion in *Lovasco* of how extreme was the prejudice suffered by the accused by reason of the delay, therefore, has little pertinence to the Sixth Amendment claim of MacDonald that he was not accorded a speedy trial.

We, therefore, remand the case to the district court with directions to set aside its judgment, vacate the sentences, and dismiss the indictment.[8]

REVERSED AND REMANDED.

ALBERT V. BRYAN, Senior Circuit Judge, dissenting:

Murder of his pregnant wife and his 6- and 3-year old daughters, with a blunt instrument, a knife and an ice pick, between midnight and dawn on February 17, 1970, in their home at Fort Bragg, North Carolina, was charged to Jeffrey MacDonald by a Federal indictment. His guilt and sanity were established to the satisfaction of the trial jury beyond a reasonable doubt. Nevertheless, this court absolves him forever of this hideous offense, shockingly laying his release exclusively on the failure of the Government to prosecute within a shorter time than it did. The majority's resolution is achieved through utilization of the Sixth Amendment's exaction that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial . . ."[1] This implementation of the constitutional clause was held untenable by the District Judge, and I agree.

The opinion of the majority here alludes to *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), a decision that gives guidance in the application of this clause. In *Barker*, the Supreme Court charted a balancing test, identifying four factors the courts should consider in ascertaining whether the right to a speedy trial has been denied: the length of the delay; the reason for the delay; the defendant's assertion of the right; and prejudice to the defendant resulting from the delay. *Id.* at 530, 92 S.Ct. at 2191. The Court emphasized, however, that "[a] balancing test necessarily compels courts to approach speedy trial cases on an *ad hoc* basis. [The Court] can do little more than identify some of the factors which courts should assess in determining whether a particular defendant has been deprived of his right." *Id.* Keeping in mind the Court's repeated admonition that none of the four points mentioned is determinative but, rather, that "they are related factors and must be considered together with such other circumstances as may be relevant," *id.* at 533, 92 S.Ct. at 2193, the appellant's speedy trial premise should be rejected.

With regard to the first factor, the length of the delay, the appellant calls attention to the lapse of five years between the date of the crime, February 17, 1970, and the return of the indictment, January 24, 1975.[2] Baldly stated, the count of five years conjures up serious prosecutorial dawdling, but in the light of the record this appearance vanishes.

Immediately upon word of the crimes, the Army's Criminal Investigation Division (CID) took the primary role in the investigation. Not until May 1, 1970, however, did the Army charge MacDonald with the murders. On October 23, 1970, the commanding general of MacDonald's unit at Fort Bragg

8. *Strunk, aka Wagner v. United States*, 412 U.S. 434, 440, 93 S.Ct. 2260, 2263, 37 L.Ed.2d 56 (1973).

1. Incidentally, Congress has declared that there shall be no limitation of time on a prosecution for murder. 18 U.S.C. § 3281.

2. It is conceded that the Government is not responsible for any significant delay occurring since then.

dismissed the case after reviewing the investigating officer's report which concluded that the charges were "not true."

Nevertheless, upon the request of the Department of Justice, the CID still pursued the inquiry in an "extensive and wide ranging" discovery effort. In June, 1972, it submitted to the Department a 13-volume report; supplements thereto were transmitted in November, 1972, and August, 1973, at the Department's request. These reports reflected the sweeping breadth of the investigation, which embraced almost 700 interviews and numerous scientific tests. A number of Government attorneys having reviewed and evaluated the reports, a grand jury was impanelled in August, 1974—only one year after the filing of the CID's final investigative report—to consider the MacDonald family murders.

While the grand jury was taking evidence, the Federal Bureau of Investigation continued the probe. Its exploration led to the exhumation of the bodies of the three victims; the object was to obtain samples of their hair, in order to compare them with strands found on pieces of evidence in the MacDonald home. Obviously, neither the grand jurors nor the Government were idle between the calling of the jury in August, 1974, and the return of the indictment in January, 1975.

The crucial period of delay attributable to the Government, then, is, at most, the period of slightly more than two years between the CID's submission of its initial, major report in June, 1972, and the convening of the grand jury in August, 1974. Even assuming that the case could have been put before a grand jury at an earlier date, the fact that some substantial delay occurred only touches off inquiry into the other relevant factors and does not itself establish a constitutional deviation. *Barker v. Wingo*, 407 U.S. at 530, 92 S.Ct. at 2191.

Passing to the second factor isolated in *Barker*—the justification the Government offers for its delay—contrary to the majority's condemnation of the Government, to me the deferment of grand jury submission was well advised, both in public concern and in fairness to MacDonald. Certainly, the Department of Justice was wise to await a mature completion of the CID's inquisition, taking advantage of the comprehensiveness and expertness of its scrutiny and evaluation of the evidence.

Fairness to MacDonald, too, dictated postponement of the calling of a grand jury. Historically, the grand jury has been, and presently still stands as, an institution interposing a bulwark for the protection of the individual citizen as well as of the public. Because an indictment is a solemn charge, whether followed by a verdict of guilty or an acquittal, the deliberations and returns of a grand jury should never be regarded as mere formalities. Notwithstanding that, after acquittal, the indictment is theoretically without force or effect, as a practical matter, it brands the subject as a criminal suspect for the rest of his life; it will be recalled whenever his name is mentioned, especially when the offense charged is particularly grave or shocking. In addition to the personal anxiety and humiliation anyone so accused endures, the practical consequences of this stigma to a banker, lawyer, physician, or any person holding a position of responsibility may be devastating. It follows as a matter of fairness that no one should be exposed to this future shadow until the Government has gleaned all available evidence.

Appellant contends, and the majority agrees, that the justifications the Government offers for its delay in seeking the indictment are wholly unacceptable. Insofar as the Government may cite internal bureaucracy as a source of postponement, some disapproval may be warranted. Nevertheless, the quantity of evidence amassed, and the time required to assess it, must be taken into account. The 1972 report, it will be remembered, comprised not less than 13 volumes; these had to be closely read and digested, not given just a sketchy oversight. Finally, it should be kept in mind throughout, any failure of the Government's explanation completely to justify the entire period of delay is not

decisive; it is merely a factor to be considered in the balance.

As to the third consideration enumerated in *Barker*, it is indisputable that MacDonald attempted to assert his right to a speedy trial. During the years involved, he manifested an eagerness to have the matter resolved and apparently did nothing to impede the progress of the prosecution.

The fourth factor to which *Barker* directs attention is prejudice to the defendant. There and in *Moore v. Arizona*, 414 U.S. 25, 94 S.Ct. 188, 38 L.Ed.2d 183 (1973) (per curiam), the Court "expressly rejected the notion that an affirmative demonstration of prejudice was necessary to prove a denial of the constitutional right to a speedy trial." *Id.* at 26, 94 S.Ct. at 189. The majority here relies on that precept in averring that the delay in MacDonald's indictment gave rise to "the substantial possibility of prejudice," and in deeming that possibility a sufficient basis for concluding that his right to a speedy trial had been denied.

Admittedly, MacDonald need not affirmatively prove actual prejudice as a single, essential prerequisite to his claim under the Sixth Amendment; nonetheless, we must turn to the record and to the surrounding circumstances to ascertain the extent, if any, to which MacDonald's defense was impaired directly as a consequence of the delay in prosecution.[3] Although the focus is on the *possibility* of prejudice, we must not ignore what *actually* transpired.[4] In this, I join the District Judge's finding, in his post-trial order refusing bail pending appeal, that "[t]he fears . . . that the defendant's ability to defend the case adequately might be seriously prejudiced by the pre-indictment delay *have not been borne out* in the record developed at trial." *United States v. MacDonald*, 485 F.Supp. 1087 (E.D.N.C.1979) (accent added).

Both in brief and in oral argument, appellant put forward a number of instances in which, he complains, his defense suffered as a result of the delay in his trial. A reading of the record reveals, however, that MacDonald's ability to defend himself was not significantly impaired, either in the particular ways he names or in any other manner apparent in the record.

Among the impediments to his defense MacDonald urges is deterioration of certain physical evidence between the time of the murders and the trial date. He calls attention to his pajama top, asserting that characteristics of the multiple puncture holes found in it—characteristics that might have enabled him to contradict the prosecution's

3. Prejudice is to be considered in the light of the purposes of the speedy trial right: "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." *Barker v. Wingo*, 407 U.S. at 532, 92 S.Ct. at 2193. The first concern is not raised in this case because MacDonald was subject to some form of restraint for only the brief period between April and October, 1970, and that by the Army. Moreover, acknowledging that prejudice, in the form of personal adversity unrelated to the merits of the defense, will be "inevitably present in every case to some extent," *id.* at 537, 92 S.Ct. at 2195 (White, J., concurring), *quoted in Moore v. Arizona*, 414 U.S. at 27, 94 S.Ct. at 190, it may be presumed that MacDonald suffered anxiety and concern as a result of the delay in prosecution. Nevertheless, the record reveals that he was able to proceed with his life, reestablishing himself professionally and developing new friendships. Because the postponement of his indictment does not appear to the District Judge or to me to have impaired, directly or inordinately, MacDonald's personal life during the period at issue, this form of prejudice is not a crucial factor in this case. Therefore, the analysis will focus on the third concern, prejudice to MacDonald's defense on the merits.

4. The opinion of the Supreme Court holding that this prosecution could not be dismissed on speedy trial grounds prior to trial on the merits, *United States v. MacDonald*, 435 U.S. 850, 98 S.Ct. 1547, 56 L.Ed.2d 18 (1978), *rev'g* 531 F.2d 196 (4th Cir. 1976), supports this approach. The Court noted that "[t]he resolution of a speedy trial claim necessitates a careful assessment of the particular facts of the case" after those facts have been established at trial. *Id.* at 858, 98 S.Ct. at 1551. The Court added: "Before trial, of course, an estimate of the degree to which delay has impaired an adequate defense tends to be speculative." *Id.* One of the advantages of reviewing such a motion after a decision on the merits has been rendered, therefore, is that, for the most part, speculation can be avoided.

damaging inferences—had vanished with time. Advertence to the record discloses, however, that the loss of these characteristics (the visible differences between "entry holes" and "exit holes") took place rapidly and may not be attributed specifically to the two-year delay imputed to the Government; indeed, it is admitted that even in 1971 few of the holes in the garment could be identified as entry or exit holes. Another of MacDonald's aggrievements centers on the deterioration of a bloody footprint, which he was no longer able to distinguish adequately at trial. He had not contested the print as his, however, and he fails to show the import of that line of inquiry. Other contentions of changes in the physical evidence likewise do not demonstrate convincingly that the defendant's situation was significantly weakened by the delay in indictment.

The next ground for MacDonald's insistence as to prejudice is the effect of the delay on the testimony of witnesses. Foremost in this argument is the impact of the postponement on the testimony of Helena Stoeckley. MacDonald contends that delay effectively robbed him of the benefit of her testimony because, in the intervening period, she had lost memory of her activities, her whereabouts, and her companions on the night of the murders, and of certain inculpatory remarks she subsequently had made.

The majority agrees with appellant that Stoeckley's statement at trial that she could not recall her activities in the critical hours "had a great potential for prejudice to Mac-Donald, given the substantial possibility that she would have testified to being present in the MacDonald home during the dreadful massacre." *Supra,* at 264. Nothing in the record, however, warrants the assumption that Stoeckley would have or could have given the testimony the majority would ascribe to her had the Government secured its indictment earlier.

Stoeckley herself in her trial testimony explains that her inability to recall the pre-dawn events of February 17, 1970, resulted from her consumption, earlier in the evening, of large quantities of drugs; she in no way indicated that *time* had weakened her recollection. The evidence given by a neighbor of Stoeckley's at the Army hearings in 1970 narrates that, within a week or two of the murders, Stoeckley told him that she could not remember where she had been on the night of the crime. Similarly, the record reveals that the statements concerning the murders, which she reputedly made to various persons in the months and years preceding MacDonald's trial, are vague, fragmented and contradictory; they do not indicate simply a gradually fading memory, eroded by time.[5] Unmaintainable on the record is the majority's position that it was "reasonable to expect [Stoeckley] might have testified" that she witnessed the murders and that "[t]he Government's inexcusable delay of over two years' duration cannot be eliminated as a potential—indeed a probable—cause of [her] memory lapse." *Supra* at 264. Instead, the record fully upholds the Government's contention that any culpable delay on its part had no discernible effect on Stoeckley's testimony. Furthermore, none of the other instances of preju-

---

**5.** The District Judge noted, with regard to Stoeckley's testimony at trial:

Stoeckley was put on the stand by defense counsel and questioned at considerable length about her knowledge of the MacDonald murders. The substance of her testimony was that she was not involved in the murders but that because of her drug-crazed condition she had at least come to wonder whether or not she was in fact involved, and she admitted to owning . . . clothing [similar to that ascribed by MacDonald to one of the alleged intruders] . . . and to the fact that she seemed to go into mourning following the murders. The Court gained the unmistakable impression which it believes was shared by the jury that this pathetic figure was suffering from drug-induced mental distortion and that she could be of no help to either side in the case.
*United States v. MacDonald,* 485 F.Supp. 1087 (E.D.N.C.1979). Totally apart from the question of the trustworthiness or untrustworthiness of Stoeckley's testimony, her remarks on the stand do not reflect a diminishing recollection of the events of nine years before, but rather a pre-existing gap in her ability to recount those events. This gap cannot reasonably be attributed to the prosecution's failure to secure an indictment earlier.

dice he lists tends to prove that MacDonald's ability to defend himself was impaired significantly by the deferred indictment.

Finally, in this case, viewed in its entirety, the absence of substantial prejudice and the reasonable assessment of the other factors to which *Barker* draws attention do not sustain the accusation that the Government disregarded its constitutional duty to bring MacDonald promptly to trial or trampled on the aims of the Sixth Amendment.

Affirmance of the judgment now on appeal is demanded by the record.