## UNITED STATES of America, Appellee,

v.

## Jeffrey R. MacDONALD, Appellant.

### No. 79–5253.

United States Court of Appeals, Fourth Circuit.

Argued June 9, 1982.

Decided Aug. 16, 1982.

Certiorari Denied Jan. 10, 1983.
See 103 S.Ct. 726.

See also, 4 Cir., 585 F.2d 1211.

Ralph S. Spritzer, University of Pennsylvania, Philadelphia, Pa., Bernard L. Segal (Wendy P. Rouder, San Francisco, Cal., Michael J. Malley, Phoenix, Ariz., Wade M. Smith, Raleigh, N.C., on brief), for appellant.

John F. De Pue and Brian M. Murtagh, Dept. of Justice, Washington, D.C. (Samuel T. Currin, U. S. Atty., James Blackburn, Asst. U. S. Atty., Patricia L. Holland, Barbara L. Miller, Dept. of Justice, Raleigh, N.C., on brief), for appellee.

Before BRYAN, Senior Circuit Judge, MURNAGHAN and SPROUSE, Circuit Judges.

ALBERT V. BRYAN, Senior Circuit Judge:

In *United States v. MacDonald*, —— U.S. ——, 102 S.Ct. 1497, 71 L.Ed.2d 696 (1982), the Supreme Court reversed our holding[1] that appellant's Sixth Amendment right to a speedy trial was abridged by the Government's delay in obtaining the indictment. On remand, we now speak to MacDonald's remaining advancements of error. *See id.* at —— n.4, 102 S.Ct. at 1500 n.4. Since the Supreme Court's opinion scrupulously chronicles both the facts of record and the protracted history of the case, *see id.* at ——, 102 S.Ct. at 1499–1500, we forego repetitious narration.

## I. *Due Process*

■ Our first concern is the accused's grievance that the two-year interval between the termination of the military proceedings and the grand jury's convocation[2] amounted to a denial of constitutionally-guaranteed due process. Laggardness in prosecuting a criminal charge rightfully exposes the Government to censure. Still, not every delay is of Constitutional moment. Indeed, we conclude that the instant hiatus, although objectionable, falls short of Constitutional injury.

To maintain this challenge, MacDonald must initially identify prejudice ascribable to the two-year gap. While a Sixth Amendment violation is made out merely by showing the potential for prejudice, here, under the Fifth Amendment, one must demonstrate actual prejudice. *United States v. Lovasco*, 431 U.S. 783, 789, 97 S.Ct. 2044, 2048, 52 L.Ed.2d 752 (1977); *United States v. Marion*, 404 U.S. 307, 325, 92 S.Ct.

---

1. *United States v. MacDonald*, 632 F.2d 258 (4th Cir.), *rehearing denied by an equally divided Court*, 635 F.2d 1115 (1980).

2. It is now firmly established that only this period is subjected to the accusation of dilatoriness. *See* —— U.S. at —— n.12, 102 S.Ct. at 1503 n.12; 632 F.2d at 263 n.2, 268.

455, 466, 30 L.Ed.2d 468 (1971). We need not explore MacDonald's claims of actual prejudice, however, unless we also are assured that the delay "violates those 'fundamental conceptions of justice which lie at the base of our civil and political institutions,' and which define the community's sense of fair play and decency." 431 U.S. at 790, 97 S.Ct. at 2048 (citations omitted).

In this regard, we write mindful of Supreme Court guidance peculiarly applicable here. While it did not decide this question, six Justices commented on the nature of and reasons for the delay in indicting MacDonald. For the Court, Chief Justice Burger concluded:

> Plainly the indictment of an accused— perhaps even more so the indictment of a physician—for the heinous and brutal murder of his pregnant wife and two small children is not a matter to be hastily arrived at either by the prosecution authorities or by a grand jury. The devastating consequences to an accused person from the very fact of such an indictment is a matter which responsible prosecutors must weigh carefully. The care obviously given the matter by the Justice Department is certainly not any indication of bad faith or deliberate delay.

—— U.S. at —— n.12, 102 S.Ct. at 1503 n.12. *See also id.* at ——, 102 S.Ct. at 1503 (Stevens, J., concurring). We think this conclusive of the *Lovasco* test and fatal to

the appellant's Fifth Amendment argument.[3]

## II. *Psychiatric Character Testimony*

MacDonald presses, too, that the trial court was at fault in rejecting tendered expert psychiatric character testimony. *See* Fed.R.Evid. 404(a)(1). After presenting thirteen lay witnesses who vouched for his nonviolent nature, MacDonald sought to present as evidence the conclusions of Dr. Robert L. Sadoff, a forensic psychiatrist, who would opine that the defendant was possessed of "a personality configuration inconsistent with the outrageous and senseless murders of [his] family." [4] *See* Fed.R. Evid. 404(a)(1). The trial judge, however, declined to permit the witness to testify, ruling

> that irrespective of the admissibility of the proffered evidence under Rules 404 and 405. F.R.E., the probative value of the evidence was substantially outweighed by the danger of unfair prejudice, confusion of the issues and misleading the jury . . . .

485 F.Supp, 1087 at 1096–97; *see* Fed.R. Evid. 403. MacDonald now challenges this decision.

At the outset, we must recall that the appraisal of the probative and prejudicial value of evidence under Rule 403 is entrusted to the sound discretion of the trial judge; absent extraordinary circum-

---

**3.** MacDonald further avers that he was denied due process of law through pervasive prosecutorial and judicial misconduct from indictment to conviction. We reject this argument, adhering to our observation in 1980:

> [T]he case was a sensational, drawn-out one, both hotly contested and bristling with difficult issues. The district judge's handling of the heavy demands placed on him was admirable.

632 F.2d at 260.

**4.** The following written proffer was made:

> That it is recognized and accepted by reputable specialists in the field of forensic psychiatry that certain personality/emotional configurations are identifiable in human beings which, because of the mental disorders involved, are indicative of a capability or disposition to certain types of anti-social conduct, including the commission of homicides involving extreme brutality to one's own

> spouse and small children and other crimes of violence; and that, conversely, other personality/emotional configurations are identifiable which are inconsistent with such antisocial behavior.

> That based on his psychiatric examination of the defendant, it is his opinion of the character of Dr. MacDonald that the defendant was and is a man who is not given to extraordinary violent outbursts of physical violence against his wife and children; that he was and is an emotionally normal, mentally stable man, neither evasive nor apparently untruthful about the significant events of his life, including the murders of his family, who did not possess the type of personality/emotional configuration that would be consistent with and/or manifests this type of murderous assault on his wife and small children.

*See* 485 F.Supp. at 1094.

stances, the Courts of Appeal will not intervene in its resolution. *E.g., Salem v. United States Lines Co.,* 370 U.S. 31, 35, 82 S.Ct. 1119, 1122, 8 L.Ed.2d 313 (1962) (exclusion of expert testimony to be sustained "unless manifestly erroneous"); *United States v. Masters,* 622 F.2d 83, 87–88 (4th Cir. 1980) (reversed only if decision is rendered "arbitrarily or irrationally"). The District Judge was keenly aware of the factors bearing on the wisdom of admitting Dr. Sadoff's testimony and painstakingly examined each. Militating against admissibility were the cumulative nature of this testimony,[5] and the certainty of fostering a "battle of the experts" over Dr. MacDonald's psychiatric composition.[6] The Court concluded that an expansion of the inquiry into this uncertain area would more likely confuse, rather than assist, the jury. A fair reading of the record and the District Court's memorandum opinion belies any claim that this decision abused the discretion reposed in the trial court, and we refuse, as we must, the invitation to substitute our judgment for its.[7]

### III. *Pajama Top Demonstration*

We next analyze appellant's contention that the trial court erred in allowing the Government to demonstrate the similarity between the pattern of puncture holes in his pajama top and the pattern of icepick wounds in his wife's chest. The top was found draped over Mrs. MacDonald's chest when the authorities first arrived at the crime scene;[8] it was soaked with the victim's blood and, among other breaks in the fabric,[9] contained 48 round punctures. MacDonald has insisted that the shirt was damaged when, after it was pulled over his head in a scuffle and became entangled about his hands, he used it to fend off blows from an icepick wielded by the same assailants he avers murdered his family. According to his version of the incident, he placed the nightshirt on his wife's chest when he regained consciousness and discovered her body.

Suspicious of this story, the prosecution theorized that he intentionally placed the pajama top on his wife's body to disguise the fact that her blood had stained it in his fatal attack on her. Consistent with this hypothesis and the defendant's alleged maiming of the bodies to give the appearance of a massacre, the Government postu-

---

5. As noted already, thirteen lay witnesses, described by the District Court as "highly intelligent and articulate, professional business people," 485 F.Supp. at 1094, testified at length to Dr. MacDonald's good character.

6. The Government was prepared to call a parade of experts who would give opinions antipodal to Dr. Sadoff's. Under these circumstances, when ostensibly well-qualified medical experts square off with sharply divergent views, it seems likely the jury will only be confused. *See* 2 J. Weinstein & M. Berger, Evidence ¶ 405[03], at 405–36 n.18 (1981), *quoting* Falknor & Steffen, *Evidence of Character: From the "Crucible of the Community" to the "Couch of the Psychiatrist,"* 102 U.Pa.L.Rev. 980, 994 (1954).

7. Appellant places much emphasis on the following portion of the Advisory Committee's note to Rule 405 of the Federal Rules of Evidence, *reprinted in* Federal Rules Pamphlet, Criminal at 171 (West 1981):

> If character is defined as the kind of person one is, then account must be taken of the varying ways of arriving at that estimate. These may range from the opinion of the employer who has found the man honest to the opinion of the psychiatrist based upon examination and testing.

This statement, however, merely manifests that, in the opinion of the Advisory Committee, expert psychiatric testimony would be relevant evidence of one's personality. If the District Court determines that the prejudicial impact of such evidence exceeds its probative value, however, Rule 403 permits exclusion of that evidence, "[a]lthough relevant."

8. When the police first arrived at the MacDonald home, the defendant was lying across his wife's body. To administer first aid, an officer rolled him off his wife and onto the floor. This process, the defense argued, inevitably disturbed the positioning of the pajama top before the photographs of the scene were taken. Although some variation of the posture of the shirt may have been occasioned by this act, we think it unlikely that the most crucial aspect of the shirt's configuration—that is, the right sleeve being turned inside out—would be affected noticeably by this movement.

9. The shirt contained a single cigarette burn, several slashing tears, and a rip extending down from the V-neck.

lated that he riddled his wife's body with an icepick after laying the shirt across her body. Laboratory experts were asked to fold the shirt in the same manner as it was found at the MacDonald home and to determine whether the pattern of holes in the shirt and in the body coincided. Acting on these directions, the investigators folded the right sleeve inside out [10] and, after some adjustment, aligned the 48 holes so that a pattern of 21 punctures emerged. The resulting array, 5 holes on the right side and 16 on the left, bore a striking resemblance to the pattern of icepick wounds suffered by Mrs. MacDonald.

The defense contends that allowing the jury to view this exhibition was error, urging that the prejudicial impact of this demonstration far outweighed its probative value. See Fed.R.Evid. 403. Further, counsel poses the possibility that the shirt was moved before it was photographed at the crime scene, the potentially infinite ways to align the 48 holes into a pattern of 21, and a variety of plausible shortcomings in the methods employed by the Government investigators. Each of these points merits scrutiny, and each was advanced, without limitation, before the jury.

Our task, however, is not to decide this dispute. As with the District Court's refusal to admit expert psychiatric testimony on the issue of Dr. MacDonald's personality, our inquiry now is, baldly, only whether that Court abused its discretion by finding this demonstration more probative than prejudicial. See part II supra. We think the District Court's decision that this evidence was not unduly prejudicial was acceptable. See United States v. Baller, 519

F.2d 463, 466 (4th Cir.), cert. denied, 423 U.S. 1019, 96 S.Ct. 456, 46 L.Ed.2d 391 (1975). We therefore do not think its ruling was an abuse of discretion.[11]

### IV. The Rock Report

Next, MacDonald argues the District Court erred when it refused to allow into evidence the findings and conclusions of Colonel Warren V. Rock, the investigating officer designated by the Army in 1970 to determine whether probable cause existed to prosecute MacDonald.[12] Principally, MacDonald argues the report was admissible as a public record under Fed.R.Evid. 803(8)(C).

Under Article 32 of the Uniform Code of Military Justice, an accused has a right to a pre-court martial investigation. An impartial officer is charged with assembling the evidence, ascertaining what charges may be brought, whether the charges are true, and what disposition should be made of the accusations in the interest of justice and discipline. See 10 U.S.C. § 832(a) (1976). While this probe is purely advisory, the subject is furnished counsel with the right to cross-examine witnesses. The officer then must forward a report to the appropriate military authorities. Id.

MacDonald contends that these attributes place the Rock report squarely within Rule 803(8)(C). Under this rule, public records, reports, or statements of factual findings, although hearsay, are admissible against the Government in a criminal case if "resulting from an investigation, made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness."

---

10. See note 8 supra.

11. Although each determination of the admissibility of evidence under Rule 403 must be analyzed separately, we believe it instructive to note two pertinent distinctions between the psychiatric evidence that was excluded by the District Court and the nightshirt demonstration which was admitted. Perhaps most significant is that the demonstration of the pajama top was in no way repetitive of any earlier testimony or demonstration. Additionally, however, the District Court made the determination, well-supported by authority, that psychiatric

characterizations of personality are the type of evidence that the Court in Baller said "an exaggerated popular opinion of the accuracy of a particular technique makes its use prejudicial or likely to mislead the jury." Despite the error inherent in all scientific inquiry, we find no abuse of discretion in the decision that the examination of physical evidence is more reliable than the conclusions of a psychiatric examination of a person's character.

12. See Uniform Code of Military Justice art. 32, 10 U.S.C. § 832 (1976).

The Government attacks its admissibility, pressing first that it was not trustworthy because in the years after 1970, a more detailed and sophisticated examination of physical and other proof was possible and second, that even if literally acceptable, the District Court had discretion, which it properly exercised, to exclude the proffer on grounds of irrelevance, prejudice, or confusion.

Although Rule 803(8)(C) apparently has never been construed in this context, we think it apparent that the Rock report met the facial standards of admissibility. It was a) a "public record," b) to be introduced against the Government in a criminal case, c) containing factual findings, d) made pursuant to an investigation mandated by law, e) containing, given the impartiality of the investigating officer, the availability of counsel, and the right to examine and cross-examine, adequate circumstantial assurances of trustworthiness. This conclusion only begins our inquiry, however, because Rule 803 does not mandate admission, it only allows reception of qualifying evidence.

In *Cox v. Babcock E. Wilcox Co.*, 471 F.2d 13 (4th Cir. 1972), we indicated that the admission of evaluative public records was discretionary with the trial court. Citing the dissent from the denial of rehearing in *Smith v. Universal Services, Inc.*, 454 F.2d 154, 160 (Dyer, J., dissenting), we said that a trial judge's decision to reject an EEOC investigative report was unassailable. As *Smith* made clear, such reports at times suffer from an undue risk of prejudice. To the extent they contain credibility determinations, they tend to undermine the exclusive province of the jury.

Such reasoning upholds the presiding judge's disallowance of Colonel Rock's findings and conclusions. While the Court properly could have admitted the evidence, we do not question the ruling of declination. The ultimate query to the jury in this case was whether defendant committed the crimes charged. Nowhere has appellant shown that this report would have helped towards an answer to this question. In-deed, its admission would have tended to perplex, in that it likely would have distracted the jury's attention from its task of ascertaining guilt or innocence to a second-guessing of the Government's conduct of the murder investigation. There is no question that MacDonald was free to call any witnesses who testified in the Article 32 investigation or, indeed, to use such testimony, as appropriate, at his trial. Under these circumstances, we think the District Court sensitively concluded that the Rock report should be excluded. Seeing no abuse of discretion, we reject this assignment of error.

## V. *The Stoeckley Witnesses*

■ Finally, appellant lays fault to the District Court's exercise of discretion in excluding the testimony of seven witnesses, all of whom would have testified to various inculpatory comments or statements assertedly made by Helena Stoeckley. The exclusion of this evidence, charges MacDonald, was error in that it abridged appellant's Fifth Amendment right to call witnesses in his own defense, was admissible under Rule 804(b)(3) and, in any event, constituted proper impeachment of Stoeckley's own testimony. Reviewing the evidence in question, we analyze these contentions in turn.

### A

Since the commission of the crimes in February 1970, MacDonald has maintained that he and his family all were victims of a bizarre cult attack. He claims that the perpetrators included three men and a woman wearing a floppy hat, having blond hair, and wearing boots. The woman, he says, was Helena Stoeckley.

At trial, Stoeckley testified that although her hair was brown in color, she owned a blond wig at the time of the crimes. She further said that she owned a floppy hat and boots. Although her recollection of events on the evening of February 16 and during the early morning hours of February 17 was, at best, hazy, she recalls not wearing the blond wig. However, she admitted to burning the wig and discarding the boots two days later.

While Stoeckley offered this much evidence seeming to corroborate MacDonald's version of the killings, the remainder of her testimony either contradicted him or tended to undercut his narration of the events. For example, she testified that she had never seen MacDonald before trial, had never been in his Fayetteville apartment, and while she vaguely felt that she might have had some connection with the crimes, since she had no explanation of her whereabouts between midnight and 5:30 a. m., she insisted she was not present at their commission. In all, the evidence disclosed that Stoeckley's memory was exceedingly poor and that she was constantly under the influence of narcotic drugs.

Because of this faulty memory, appellant sought to introduce a series of inculpatory statements through other witnesses. In this proffer to the District Court, in the absence of the jury, it was shown that these witnesses would give evidence substantially as follows:

1) Robert A. Brisentine, an Army investigator assigned to the homicides, interviewed Stoeckley April 23 and 24, 1971, approximately 14 months after the crime. Stoeckley told him she was present during the murders, but did not think that she had taken part. She offered to divulge the participants and provide more details, but wanted immunity from prosecution. Subsequently, she said she had "said too much."

2) James Gaddis, an officer of the Nashville Police Department, revealed that Stoeckley had confessed her belief that she was involved in the crimes in the fall of 1970. She also said that she knew others who were involved.

3) P. E. Beasley, a former detective with the Fayetteville Police Department, explained that Stoeckley had been a reliable drug informant for several years prior to the murders. On the morning of February 18, 1970, a day after the fateful events, she told Beasley, in response to his accusation that she matched MacDonald's description of the female intruder, "[i]n my mind, it seems I saw this thing happen ... I was heavy on mescaline." Beasley also said that he observed funeral wreaths in the yard of Stoeckley's home. He added that she had told him she was mourning the MacDonalds.

4) Jane Zillioux, a Nashville neighbor of Stoeckley throughout the fall of 1970, said that Stoeckley had confided to her that she could not return to Fayetteville because she was involved in murders there. She further confessed that the victims were a woman and two small children and that she had disposed of the clothes she had been wearing to sever her connection with the crimes.

5) Charles Underhill, another Nashville acquaintance, testified that Stoeckley told him "they killed her and the two children."

6) William Posey, a neighbor of Stoeckley in Fayetteville, testified that Stoeckley told him a few days after the slayings that she didn't kill anyone herself, but did hold a light while the crime was in progress. She also confided to him that she was spotted by a policeman leaving the house.

7) Wendy Rouder, one of MacDonald's lawyers, testified that two days after Stoeckley had testified she could not remember anything about the night of the crime, she told Rouder "I still think I could have been there that night." Stoeckley also feared she would not be able to live with the guilt if MacDonald were convicted. Finally, she recalled standing by the couch in the MacDonald apartment holding a candle "only—you know—it wasn't dripping wax; it was dripping blood."

After all of these individuals had testified without the presence of the jury, the District Court excluded the evidence. It ruled the statements inadmissible hearsay because untrustworthy. In addition, the Court rejected MacDonald's attempt to use the statements as impeachment on the grounds that it was not impeachment, properly so called, and in any event, was excludible under Rule 403 as unduly confusing and prejudicial.

B

Relying on *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297

(1973), MacDonald complains that the exclusion of the testimony of these seven "Stoeckley witnesses" deprived him of due process. He also maintains that Fed.R. Evid. 804(b)(3) explicitly supplies an exception to the hearsay rule and authorized admission of the Stoeckley witnesses' testimony.

*Chambers* involved an appeal of a criminal conviction obtained after the refusal of the trial court to permit defendant to introduce the testimony of three witnesses who would have said that one Gable MacDonald admitted to each witness that he was guilty of the murder charged to Chambers. The Mississippi courts excluded the testimony on the ground that it was hearsay and not admissible under any exception recognized in that State. Particularly, Mississippi did not recognize statements against one's penal interest as an exception to the general hearsay prohibition.

The Supreme Court reasoned that enforcement of this hearsay rule denied Chambers' due process. In so concluding, it found sufficient indications of trustworthiness in the circumstances of McDonald's admissions. For example, the evidence disclosed that each of the three witnesses was a close associate of McDonald and that McDonald had made the damaging remarks spontaneously. In addition, they were corroborated by other facts—a sworn (although subsequently repudiated) confession by McDonald, testimony of an eyewitness putting McDonald at the crime scene, proof that McDonald owned a gun similar to the weapon used, and evidence that he was seen with the gun just after the shooting—giving credence to the asserted veracity of the hearsay. Finally, the Court noted that McDonald was present and available for the prosecution to call to the stand if it so chose. In circumstances "where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice." *Id.* at 302, 93 S.Ct. at 1049.

■ This ruling, in large measure, is codified for Federal Courts in Fed.R.Evid. 804(b)(3).[13] It conditions admissibility on the unavailability of the declarant, and provides that a statement of the declarant is admissible if

> at the time of its making [it was] so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, or to render invalid a claim by him against another, that a reasonable man in his position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

Fed.R.Evid. 804(b)(3). Thus, as applied to criminal matters, three requisites must be met prior to reception of the hearsay testimony. First, the declarant must be unavailable. Second, from the perspective of the average, reasonable person, the statement must have been truly adverse to the declarant's penal interest, considering when it was made. *Cf. United States v. Evans*, 635 F.2d 1124 (4th Cir. 1980), *cert. denied*, 452 U.S. 943, 101 S.Ct. 3090, 69 L.Ed.2d 958 (1981) (suggesting that statement is not against penal interest where declarant made statements which appeared to subject

---

**13.** Two qualifications, however, should be made. First Rule 804(b)(3) conditions admissibility on the unavailability of the declarant. In contrast, the *Chambers* Court found that the declarant's availability strengthened its conclusion that the declarant's admissions were reliable. One could argue that *Chambers* applies only where the declarant is available and where he is unavailable, the sole basis for contesting admissibility is Rule 804(b)(3).

Rather than drawing this distinction, however, we hold that *Chambers* and Rule 804(b)(3) impose the same standard. In so declaring, however, we do not mean to constitutionalize this or any other Federal Rule of Evidence. *Chambers*, it must be recalled, is peculiar because it arose in a State Court. Where a case arises in Federal Court, our supervisory power usually allows us to avoid treating evidentiary matters as Constitutional issues.

himself to criminal liability but which actually would constitute defense to more serious crime). Finally, corroborating circumstances must clearly establish the trustworthiness of the statement. *United States v. Satterfield*, 572 F.2d 687 (9th Cir.), *cert. denied*, 439 U.S. 840, 99 S.Ct. 128, 58 L.Ed.2d 138 (1978).

We have no difficulty in agreeing with appellant that declarant Stoeckley was unavailable [14] and that her statements, if true, clearly would be against her penal interest. The question remains, however, whether the "corroborating circumstances clearly indicate the trustworthiness of the statement[s]."

As corroborating circumstances, MacDonald adverts to the fact that Stoeckley owned and regularly wore boots, a blond wig, and a floppy hat, thus permitting her to fit the description of the female assailant described by defendant. In addition, defendant argues that Stoeckley had no motive to fabricate; that each admission was consistent with the others; that, for the most part, her declarations were spontaneous and to close associates; that at the time of their making, she was (and is) still subject to criminal liability, and in making these statements, she recognized this fact; that she cannot account for her whereabouts on the night of the crime; and that her mourning the deaths evinces a consciousness of guilt. The District Court, by contrast, concluded the declarations were untrustworthy because Stoeckley's pattern of remarks in admitting and denying complicity rendered her hopelessly unreliable, and because her pervasive involvement with narcotic drugs, and her admissions that she was under the virtually continual influence of the drugs when these statements were made further manifested unreliability.

■ As with other of these evidentiary objections, our role in reviewing decisions at *nisi prius* construing Rule 804(b)(3) is a limited one. We must uphold the trial court unless it has abused its discretion. *See*

*United States v. Guillette*, 547 F.2d 743 (2d Cir. 1976). No such abuse is evident here.

It is to be recalled that Rule 804(b)(3) places upon the proponent of a statement against interest a formidable burden. The declaration offered to exculpate the accused must be supported by corroborating circumstances that "*clearly* indicate the trustworthiness of the statement." (emphasis added). *Cf.* Fed.R.Evid. 804(b)(5) (residual exception only requires "equivalent circumstantial guarantee of trustworthiness"). As the Advisory Committee's Notes on this provision instruct, the risk of fabrication in this setting is significant. Consequently, rather than permitting only the jury to decide what weight to give the evidence, the initial responsibility is vested in the District Court. It is admonished that "[t]he requirement of corroboration should be construed in a manner [so] as to effectuate its purpose of circumventing fabrication." *See* Advisory Committee's Notes to Rule 803, *reprinted in* Federal Rules Pamphlet, Criminal at 222 (West 1981).

At bottom, the sticking point here, as recognized by the District Court, is the fundamental problem of trustworthiness. While MacDonald is able to point to a number of corroborating circumstances, he does not demonstrate, finally, that they make Stoeckley's alleged declaration trustworthy. Her apparent longstanding drug habits made her an inherently unreliable witness. Moreover, her vacillation about whether or not she remembered anything at all about the night of crime lends force to the view that everything she has said and done in this regard was a product of her drug addiction. Given the declarant's "pathetic" appearance, our conviction is that the District Court was not in error in adjudging that defendant failed to carry his burden under Rule 804(b)(3). Thus MacDonald's argued violation of the Due Process clause fails.

## C

Failing to establish the truth of the proffered Stoeckley declarations, MacDonald

---

14. Stoeckley actually testified at length at the trial. As to the subject matter of these statements, however, she claimed a loss of memory. Rule 804(a)(3) specifically includes asserted loss of memory as within the definition of "unavailability."

endeavored to use this same testimony as impeachment of Stoeckley's own testimony. The trial judge rejected the attempt, but on alternative grounds. To begin with, he explained that the testimony was unduly confusing and not proper as impeachment since its substance already had been ruled inadmissible for its truth. Second, the Court concluded that the evidence to be offered by the Stoeckley witnesses did not contradict Stoeckley's own sworn testimony. Rather, it merely tended to supplement her statements.

The Court, we believe, properly used Rule 403 to exclude such testimony. As we observed in *United States v. Morlang*, 531 F.2d 183 (4th Cir. 1975), there is a significant danger of prejudice where evidence is adduced for impeachment purposes that could not be presented directly on the merits of the case. *Id.* at 190. Of course, as defendant rightly notes, Fed.R.Evid. 607 permits a party to impeach its own witness. Still, where as here, the jury is likely to be confounded by statements which Stoeckley repeatedly avowed under oath she did not remember making, the District Court properly can exclude them under Rule 403.

### VI

■■ At end, MacDonald asserts that the evidence, even when taken most favorably for the prosecution, does not justify the finding of guilt beyond a reasonable doubt. *See Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942). Our canvass of the record, however, gives ample warrant for the verdict. With no merit in any issue on this appeal, the judgment of conviction is affirmed.

*Affirmed.*

1. *Cf. United States v. Poland*, 659 F.2d 884, 895 (9th Cir. 1981), *cert. denied*, 454 U.S. 1059, 102 S.Ct. 611, 70 L.Ed.2d 598 (1981).

2. Note that the test is not whether the district judge is satisfied that the statement is actually true as to the fact it is adduced to prove. Responsibility for that determination rests with the jury, as fact finder, not with the judge. The rule is not intended to allow the trial judge to

MURNAGHAN, Circuit Judge, concurring:

On the discretion of the district judge, the opinion of Judge Bryan rests. On the present state of the law as it applies to the particular case before us, I find myself, albeit not without substantial misgiving, obliged to concur.

Nevertheless, I perceive a useful purpose for future cases in addressing one troubling aspect. It is evident that a basis may be erected for finding the hearsay statements of Helena Stoeckley untrustworthy. Given the wide discretion vested in the trial judge, we should not fault Judge Dupree to the extent of reversing.[1] Nevertheless, in view of the issues involved, and the virtually unique aspects of the surrounding circumstances, had I been the trial judge, I would have exercised the wide discretion conferred on him to allow the testimony to come in. My preference derives from my belief that, if the jury may be trusted with ultimate resolution of the factual issues, it should not be denied the opportunity of obtaining a rounded picture, necessary for resolution of the large questions, by the withholding of collateral testimony consistent with and basic to the defendant's principal exculpatory contention. If such evidence was not persuasive, which is what the government essentially contends in saying that it was untrustworthy, the jury, with very great probability, would not have been misled by it.

In deciding whether a statement against interest should be admitted under the exception to the hearsay rule, the court must determine whether the "corroborating circumstances clearly indicate the trustworthiness of the statement." F.R.Evid. 804(b)(3). The question is whether the statement is believable,[2] that is to say appears to have

admit only that evidence which satisfies him or conforms to his views as to what the disposition of the case should be. *Cf.* 4 Weinstein's *Evidence* ¶ 804(b)(3)[03] and the pungent comments relative to a trial judge's assessment of trustworthiness of the witness, rather than of the declarant: "The corroboration requirement should not be used as a means of usurping the jury's function."

been clearly within the competence of the witness to observe, without a demonstrable intention or disposition to prevaricate. *See United States v. Atkins*, 558 F.2d 133, 135–136 (3d Cir. 1977), *cert. denied*, 434 U.S. 929, 98 S.Ct. 416, 54 L.Ed.2d 289 (1977). There the district judge had excluded an overheard acknowledgment of guilt by someone other than the defendant because the witness was a minor, who had not completed high school, was unemployed, and was on welfare. The allegedly overheard conversation occurred outside a bar on a crowded street corner and was deemed unreliable by the district judge. In reversing, the Third Circuit emphasized that immediately after the witness overheard the declarant confess murder she saw parts of a rifle or shotgun in his car trunk, promptly told the story to the victim's family and accompanied them to the police station.

Credibility can be established in various ways. Considerations include the circumstances surrounding the statements, *United States v. Atkins, supra,* and the absence of motivation on the part of the declarant to fabricate, *United States v. Thomas,* 571 F.2d 285, 290 (5th Cir. 1978) ("... the possibility of fabrication which is the rationale of the corroboration requirement, is slight. Weeks had no motive to falsify," he being a co-defendant who had pleaded not guilty). Another factor deserving recognition is that of the general societal frame of reference. The latter can provide increased support for the believability of statements such as the ones now at issue. The likelihood of the truth of a seemingly outrageous story grows when an appreciation of current events is applied to the known facts and circumstances of a given case.

The defense of a marauding, drug-crazed purposeless group of homicidal maniacs is one which, absent the events surrounding the behavior of Charles Manson and the excruciating horror of the indescribably base murder of Sharon Tate, would have been dismissed as so incredible as to merit no serious attention. All that changed with the advent of Manson. Thereafter the possibility of such an occurrence, while still macabre, was considerably enhanced. The evidence, in my humble judgment, tended to show an environment in the vicinity of the military base where MacDonald was stationed in which persons might indeed emulate Manson or independently behave in such a fashion. Helena Stoeckley was shown to be a person of no fixed regularity of life, roaming the streets nocturnally at or about the time of the crimes, dressing in a bizarre fashion, and capable of so short-circuiting her mental processes through an indiscriminate taking of drugs that (a) she could well accept her presence and, to some extent, her involvement in the MacDonald murders and (b) she could become so separated from reality that, on the fatal evening, she was ripe for persuasion to participate.

It should be emphasized that the condition on admissibility of corroborating circumstances indicating trustworthiness represents an accommodation between concern about third party confessions and their high potential for fabrication, on the one hand, and awareness of the enhancement of reliability flowing from the exposure to punishment for crime for the confessing declarant, on the other. Notes of the Advisory Committee on the Proposed Federal Rules of Evidence. Rule 804(b) *Exception* (3): "The requirement of corroboration should be construed in such a manner as to effectuate its purpose of circumventing fabrication." The reason prompting Congress to add the corroboration provision to F.R.Evid. 804(b)(3) derived from the "special dangers of a trumped-up confession by a professional criminal or some person with a strong motive to lie." 4 Weinstein's *Evidence* ¶ 804(b)(3)[03], at 804–103.

The record in the case satisfies me that, among the possible motivations leading to the statements of Helena Stoeckley, fabrication was not a likely one. The matter of what constitutes corroborating circumstances which clearly indicate the trustworthiness of the statement was left for judicial (i.e. case-by-case) development. 11 Moore's Federal Practice § 804.06(3)[2], at VIII–281. "It is clear that the standard for corroboration must not be too high." *Id.* at VIII–283.

A factor of corroboration cited by Justice Holmes in his famous dissent in *Donnelly v. United States*, 228 U.S. 243, 277, 33 S.Ct. 449, 461, 57 L.Ed. 820 (1913) was "that there be no connection between declarant and accused." 4 Weinstein's *Evidence* ¶ 804–104, n.6. MacDonald and Stoeckley were not in any way acquainted.

> Weinstein additionally has this to say: The court should only ask for sufficient corroboration to "clearly" permit a reasonable man to believe that the statement might have been made in good faith and that it could be true. If, for example, the proof is undisputed that the person confessing to a shooting could not have been at the scene of the crime because he was in prison, it will be excluded. But if there is evidence that he was near the scene and had some motive or background connecting him with the crime that should suffice.

*Id.* 804–104–05. But *cf. Lowery v. State of Maryland*, 401 F.Supp. 604, 607 (D.Md.1975), *aff'd without published opinion*, 532 F.2d 750 (4th Cir. 1976), *cert. denied*, 429 U.S. 919, 97 S.Ct. 312, 50 L.Ed.2d 285 (1976).

For all those considerations, my view is that the testimony should have been admitted. But it would read out of the law the concept of trial court discretion were courts of appeals to label as "abuse of discretion" any action by a district court with which the appellate court disagrees. Accordingly, I do not regard it proper to dissent.

I conclude with the observation that the case provokes a strong uneasiness in me. The crimes were base and horrid, and whoever committed them richly deserves severe punishment. As Judge Bryan has pointed out, the evidence was sufficient to sustain the findings of guilt beyond a reasonable doubt. Still, the way in which a finding of guilt is reached is, in our enduring system of law, at least as important as the finding of guilt itself. I believe MacDonald would have had a fairer trial if the Stoeckley related testimony had been admitted. In the end, however, I am not prepared to find an abuse of discretion by the district court, and so concur.