**UNITED STATES of America, Appellee,**

v.

**Jeffrey R. MacDONALD, Appellant,**

**National Association of Criminal Defense Lawyers, Amicus Curiae.**

No. 85–6208.

United States Court of Appeals,
Fourth Circuit.

Argued Oct. 7, 1985.
Decided Dec. 17, 1985.

Brian O'Neill (Myrna K. Greenberg, Santa Monica, Cal., on brief), for appellant.

Brian M. Murtagh, Sp. Asst. U.S. Atty., John F. De Pue, Dept. of Justice, Washington, D.C., (Samuel T. Currin, U.S. Atty., Raleigh, N.C., on brief) for appellee.

(Ephraim Margolin, Chairman, Amicus Curiae Committee, Natl. Ass'n of Criminal Defense Lawyers, San Francisco, Cal., on brief), for amicus curiae.

Before RUSSELL and MURNAGHAN, Circuit Judges, and HAYNSWORTH, Senior Circuit Judge.

HAYNSWORTH, Senior Circuit Judge:

Jeffrey MacDonald was convicted of the gruesome murder of his wife and two young daughters, and his convictions were affirmed on appeal. *United States v. Mac-Donald*, 688 F.2d 224 (4th Cir.1982). Subsequently he filed two motions for relief under 28 U.S.C. § 2255, one motion for a new trial under Rule 33 F.R.Cr.P., and a fourth motion under 28 U.S.C. § 455 to have the trial judge recuse himself. All four motions were denied.

We find no merit in this appeal, and affirm.

## I.

The attempt to disqualify the trial judge was based upon the judge's relationship with Jimmy Proctor, who, at the time of the judge's appointment, was an assistant United States Attorney in the Eastern District of North Carolina and married to the judge's daughter. In apparent recognition that he should not be practicing in his father-in-law's courtroom, Proctor resigned as assistant United States Attorney in February 1971, approximately two months after the judge's appointment. At that time the MacDonald case was in the investigative stage, and Proctor had made statements indicating a belief that MacDonald should be indicted and prosecuted.

Proctor was divorced from the trial judge's daughter on July 27, 1972.

MacDonald was not indicted until January 1975, and trial before Judge Dupree did not commence until July 1979, more than eight years after Proctor's resignation as assistant United States Attorney, and almost seven years after his divorce from the trial judge's daughter.

These circumstances present no basis for a disqualification or recusal. By the time the trial judge was called upon to make any discretionary ruling in the case, Proctor had long since ceased to be a United States Attorney and ceased to be the judge's son-in-law. The earlier relationship would have disqualified either the judge or the son-in-law, and they treated it as disqualifying the son-in-law. Termination of both branches of the disqualifying relationship, however, left no vestige of the taint requiring the trial judge to disqualify himself at the time of trial in 1979 or at the time the post conviction motions came on for a hearing in 1984. *S.J. Groves & Sons Co. v. International Brotherhood of Teamsters*, 581 F.2d 1241 (7th Cir.1978).

## II.

It is contended that MacDonald is entitled to a new trial because of evidence discovered after his conviction. This evidence consists primarily of post trial statements by Helena Stoeckley, and one each by two of her former associate drug addicts.

MacDonald's version of the events that fatal night was that his home was invaded by three men and a woman, all drunk on drugs. It was they who had attacked him and had viciously murdered his wife and children. The female invader he described as a blonde woman wearing a floppy hat and brown boots coming almost up to her knees. Helena Stoeckley had brown hair, but she sometimes wore a blonde wig, a floppy hat and high brown boots. After hearing of Dr. MacDonald's accusations, Helena Stoeckley thought that she might have been the female he described. She disposed of the wig, the hat and the boots.

Helena Stoeckley was also heavily addicted to drugs. She was a witness at the trial where she testified that she was so heavily intoxicated with drugs in the early morning hours of the night in question that she had no idea of what she had done or where she had been. Before trial, however, she had made statements to the effect that she had been, or might have been, in the MacDonald home. The statements contained internal suggestions that they were the product of fantasy. She stated, for instance, that she held a lighted candle for illumination but "it was not dripping wax; it was dripping blood."

At the trial, the defense sought to introduce evidence of two earlier hearsay statements. They were excluded as being untrustworthy, and this court affirmed the exercise by the trial judge of his discretion in excluding them for lack of trustworthiness. *United States v. MacDonald*, 688 F.2d at 230-34.

Helena Stoeckley has since died, apparently as the result of drug abuse. After the trial and during her lifetime, however, she continued to make conflicting statements. Sometimes she remembered nothing about what happened that night, while, apparently depending upon who questioned her, she sometimes remembered in some gory detail being with the slayers of the MacDonald mother and children. The details she gave, however, contain many inconsistencies with MacDonald's version of what occurred and with the circumstantial evidence derived from the scene.

Evidence was proffered that Greg Mitchell, a former associate of Helena Stoeckley, had explained to friends an apparent state of depression by saying that he had been involved in some murders.

Cathy Perry Williams, a former associate of Stoeckley's and a schizophrenic, allegedly confessed that she was one of the invading murderers. She claimed to have recalled evidence of that night in some detail, but the detail varied widely from the known physical facts, from Dr. MacDonald's version of what transpired, and from Helena Stoeckley's numerous confessions. Notably, the Williams statement would have had two women among four intruders; she had gone upstairs to get to the bedrooms, and the two children were boys.

To obtain a new trial on the basis of after discovered evidence, that evidence must be admissible in a new trial. There is substantial doubt that these hearsay statements would be admissible since corroborating circumstances do not clearly indicate their trustworthiness. *See* F.R.E. 804(b)(3); *United States v. Carvalho*, 742 F.2d 146 (4th Cir.1984). However, we need go no further than to observe that the district judge found that this melange of hearsay evidence would not produce a different result in a new trial. *United States v. Lott*, 751 F.2d 717 (4th Cir.1985). That assessment was for the district judge. There is an evidentiary basis for the finding, and there are no extraordinary circumstances that might warrant our intervention. *See United States v. Carmichael*, 726 F.2d 158 (4th Cir.1984).

If these hearsay statements had been before the jury, it is most unlikely that the jury would have given them any credence.

The circumstantial evidence made a strong case against MacDonald and demonstrated that his story was a fabrication entirely or in substantial part. Nevertheless, when his story first came out, Helena Stoeckley had no reason to doubt his truthfulness. It is clear that she thought his description of the blonde woman with the floppy hat and brown boots fit her, and a pitiable person whose memory had been completely blocked by drugs is bound to be highly suggestible. Since she could not remember where she had been or what she had been doing, MacDonald's description of the blonde woman necessarily would cause her to wonder whether she had been in the MacDonald residence and to fantasize participation in a crime as horrible as it was senseless. And, if Helena Stoeckley had been one of four intruders, some of her friends whose memories were similarly blocked by drugs might well have had similar fantasies.

Perhaps it would have been better if evidence of Stoeckley's pretrial statements had been received, as Judge Murnaghan observed in his concurring opinion, 688 F.2d at 234–36, but the district judge could appropriately find that the post trial statements were all lacking in trustworthiness and that they did not meet the materiality requirement for a new trial.

### III.

Relief under § 2255 was sought on the basis of claimed suppression of exculpatory evidence. The district judge considered each claim extensively and meticulously. We think he properly rejected them.

### A.

Blood of MacDonald's type was found on the door of a linen closet. Inside the closet were a number of medications and a supply of syringes and needles. When one of the Army investigators was being debriefed, he said that "a half filled syringe that contained an as yet unknown fluid was located in a hall closet which also contained some evidence of blood." The defense interprets the statement to refer to a syringe containing a bloody fluid, and suggests that production and analysis of such bloody fluid might have lent some support to the claim of an intrusion by drug addicts and corroborated Cathy Perry Williams' claim that the intruders had injected a drug in MacDonald.

The statement is more readily interpreted to refer to blood on or in the closet rather than to blood in a fluid within a syringe. There were, indeed, blood stains on the closet door, and, though there were detailed inventories of the contents of the closet, there was no other reference to a syringe containing fluid of any kind. The statement was made by one who had not been a participant in making the inventory of the contents of the closet; he purported to be repeating what someone else had told him, but, according to the other investigators who actually examined the contents of the closet, there was no such syringe.

### B.

In December 1970 Cathy Perry, later Williams, stabbed the soldier with whom she had been living. After she was sent away, he and a Mrs. Garcia undertook to collect Cathy's belongings. A pair of beige boots and other items were turned over to military investigators.

The beige boots were examined for blood stains or material that might connect them to the scene of the MacDonald murders. Nothing was found, and the boots were returned.

MacDonald speculates that the beige boots belonged to Helena Stoeckley rather than to Cathy Perry, and that they would be exculpatory if they were found to have been stained with blood. It is simple speculation, however, for they did not fit the description of the brown boots mentioned by MacDonald, and examination by the CID revealed no blood stains.

### C.

During an autopsy performed on the body of Mrs. MacDonald, scrapings were taken from beneath her fingernails and

placed in a vial. An Army investigator reported that he saw in the vial what he believed to be a small piece of skin. Thereafter, detailed laboratory analysis was performed, and the report of the analysis contains no mention of any skin.

Either the investigator was mistaken in believing that what he had seen in the vial was a small piece of skin, or the piece of skin was lost.

Interestingly, there were scratches on Dr. MacDonald's chest, which might have been made by Mrs. MacDonald if her husband were her slayer.

### D.

■ Helena Stoeckley had refused to be fingerprinted. Seeking her prints, an investigator was dispatched to Nashville, Tennessee to examine an apartment she had recently occupied and that was being monitored by Nashville police with her consent. He found many prints and made many photographs. Apparently with her finger, she had painted words on the walls, and the investigator photographed an upper case "G" as it appeared in such words as "Good" and "Gemini." In a handwritten note, he stated that the letter seemed to resemble the "G" in the word "Pig" that had been painted on the headboard of Mrs. MacDonald's bed. That word also had been finger painted, but there was expert opinion that it had been done by one wearing rubber gloves, for there were no traces of ridges. Dr. MacDonald had such gloves, of course, and pieces of one were found on the bed near the headboard and in a pile of bedclothing.

Prints of the photographs made in the Nashville apartment were supplied to defense counsel before trial, but, unfortunately, the investigator's handwritten note about a possible resemblance of the "G's" did not find its way into the typed explanatory material supplied to the lawyer. It is now contended that failure to supply the handwritten observation made the photographs meaningless.

Subsequent inspection in the FBI crime laboratory produced a report that neither the "G's" on the wall of the apartment in Nashville nor the "G" on the headboard contained the "inherent individual characteristics essential to a ... meaningful comparison." Moreover, the investigator who took the Nashville photographs opined that the "G's" in Nashville resembled "G's" he had seen in MacDonald's military notebooks as well as the "G" on the headboard.

### E.

The district judge concluded that the government had not deliberately suppressed anything and had acted in complete good faith. More important, however, the district judge found that this evidence did not meet the materiality requirements of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). We agree, and our view is not altered by the more recent case of *United States v. Bagley,* —— U. S. ——, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).

### IV.

■ MacDonald also claims that his Fifth and Sixth Amendment rights were violated when a psychiatrist examined him during trial. There had been an agreement upon the examination, but MacDonald now claims that the psychiatrist was a "government investigator" who asked many questions about the facts and disclosed MacDonald's answers to the prosecution. There is no support for the contention except speculation, and the district court found that the psychiatrist did not depart from his properly assigned role.

### V.

In much greater detail than we, the district judge considered every contention that MacDonald advanced. The care with which it was done is evident, and we may conclude this much briefer opinion with the statement that there is no basis upon which any ruling in this case by a meticulous district judge can be overturned.

AFFIRMED.